Motion for order of maintenance filed May 3, overruled May 25, 1915.
Argued on the merits October 9, affirmed November 14, 1916.

## IN RE NORTHCUTT.*

(148 Pac. 1133; 160 Pac. 801.)

**Parent and Child—Support of Child—Enforcement—Statutory Proceedings.**

1. Under Section 7054, L. O. L., requiring parents to maintain their children when poor and unable to work, and Section 2922, providing that every poor person, who shall be unable to earn a living, shall be supported by the father, mother, children, brothers or sisters of such person, if they or either of them be of sufficient ability, and every person who shall fail to support his or her father, mother, child, brother or sister when directed by the County Court shall forfeit $30 a month to the poor fund of the county, and such other sums as the County Court shall deem sufficient, to be recovered in the name of the County Court, the procedure to compel the support of an incapacitated adult child by a parent, provided by the latter section, is exclusive, and the Supreme Court cannot, on appeal in proceedings to have the father of such child declared a mental incompetent, order the father to pay for the support of the child pending the determination of the appeal.

**Insane Persons—Guardian—"Incapable" Person.**

2. Persons "incapable of conducting their own affairs" for whom, in addition to insane persons and idiots, Section 1319, L. O. L., authorizes the appointment of a guardian, are persons unable without assistance properly to manage and take care of their property, and who would be likely to be deceived, dominated, or imposed on by artful or designing persons; it not being enough that one does not handle his property judiciously.

**Insane Persons—Guardian—Incapable Person—Evidence.**

3. Evidence in proceeding for appointment of a guardian for one 77 years old, about to marry and move to another state, with the idea of building a lighting plant, *held* not to show that he was incapable of conducting his own affairs, within Section 1319, L. O. L.

From Marion: WILLIAM GALLOWAY, Judge.

In Banc.   Statement by MR. JUSTICE McBRIDE.

Eva Palmerton instituted proceedings in the County Court to have S. T. Northcutt, her father, declared incompetent to manage his own property, and to have a

*For authorities passing on the question of desire of aged person to marry, as ground for appointment of guardian, see note in 47 L. R. A. (N. S.) 475.                                     REPORTER.

guardian appointed for that purpose. After a trial there he was found incompetent, and E. M. Croisan was appointed his guardian. The father appealed to the Circuit Court, where the order was reversed. Whereupon the daughter appealed to this court, in which the matter is pending. She now files a motion asking that this court make an order for her temporary support out of the funds of the respondent pending the final hearing here.    MOTION OVERRULED.

*Messrs. Carson & Brown,* for the motion.

*Mr. Walter E. Keyes* and *Mr. Charles L. McNary, contra.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

At common law there was originally no legal duty of a parent to support a helpless adult child, but this defect in the law was corrected by the passage of 43 Eliz., Chap. 2, § 7, which enacted:

"The father and grandfather, and the mother and grandmother, and the children of every poor, old, blind, lame, and impotent person, or other poor person not able to work, being of a sufficient ability, shall, at their own charges, relieve and maintain every such poor person in the manner, and according to that rate, as by the justices of the peace of that county where such sufficient persons dwell, or the greater number of them at their general quarter sessions, shall be assessed, upon pain that every one of them shall forfeit twenty shillings for every month which they shall fail therein": 1 Chitty's Blackstone, *448, and note.

Section 7054, L. O. L., which is among our very early statutes, having been passed in 1853, provides:

"Parents shall be bound to maintain their children when poor and unable to work to maintain themselves;

and children shall be bound to maintain their parents in the like circumstances."

Section 2922, L. O. L., passed in 1854, provides:

"Every poor person who shall be unable to earn a livelihood in consequence of bodily infirmity, idiocy, lunacy, or other cause, shall be supported by the father, mother, children, brothers, or sisters of such poor person, if they or either of them be of sufficient ability; and every person who shall fail or refuse to support his or her father, mother, child, sister, or brother, when directed by the County Court of the county where such poor person shall be found, whether such relative reside in the county or not, shall forfeit and pay to the county, for the use of the poor of their county, the sum of $30 per month, or such other sums as the court shall find sufficient, to be recovered in the name of the County Court for the use of the poor as aforesaid before any justice of the peace or any court having jurisdiction: Provided, that when any person becomes a pauper from intemperance or other bad conduct, he shall not be entitled to any support from any relation except parent and child."

From these statutes it will be seen that a method of procedure is pointed out, which method is logically exclusive of any other. As stated by Mr. Chief Justice Wolverton, in *Faling* v. *Multnomah County,* 46 Or. 460 (80 Pac. 1009):

"The policy of the law is apparent. The County Court is vested with exclusive superintendence of the poor, and the duty of a relative to support a poor relative, within the degree of consanguinity designated, is enjoined. This much is explicit and clear. The County Court is accorded the further authority, by the strongest implication, to direct such relative possessing the ability to discharge that duty. This in furtherance of its superintendence of the poor. The court could not very well direct the relative to discharge the duty thus enjoined upon him without according him a hearing, and to such purpose it would not be improper

to cite the alleged delinquent to appear before it to show cause why the direction should not be made. Several things are to be inquired into by the court before it could regularly enter the order. It should determine the degree of consanguinity, the capability of the alleged pauper, whether he has become such from intemperance or other bad conduct, and the ability of the relative to discharge the duty. Upon these questions, and others, it might be, the relative is entitled to a hearing in regular course before he can be adjudged delinquent and derelict in duty and directed to render support. Further, however, than for the determination of these things, necessary for rendering the order against the delinquent relative, we think it was not intended that the County Court should have jurisdiction. The forfeiture spoken of is entailed by refusing to observe the direction of the County Court, which gives the county a right to recover in the name of the County Court against the relative refusing to obey the order, and a proper proceeding may be instituted for that purpose before a justice of the peace or any court having jurisdiction, and it is the province of this latter court to determine as to the forfeiture and the amount proper for recovery. In such a proceeding the County Court would not become its own arbiter, but its position would be the same as any other litigant, free to establish its cause. Thus the County Court would have the means of showing what the expense would be of maintaining the pauper, which would be the proper measure of the recovery against the relative, and thus it may substantiate its cause. The statute was probably intended, not for the punishment of the relative refusing to obey the direction of the County Court, but to give a remedy to the county by which to recover the amount necessary to the support of the pauper in its superintendence of the poor.''

Following the decision quoted, which we think is the only logical construction of our statutes, we conclude that we have no jurisdiction to make the order requested, and the motion is overruled.

MOTION OVERRULED.

Argued October 9, affirmed November 14, 1916.

ON THE MERITS.

(160 Pac. 801.)

Department 2. Statement by MR. JUSTICE HARRIS.

A petition was filed on December 16, 1914, by Mrs. Eva Palmerton for the appointment of a guardian to manage the estate of her father S. T. Northcutt, who owns notes and mortgages amounting to about $26,000. The petitioner is his daughter and only child. The daughter filed a petition asking for the appointment of a suitable person as guardian of the estate of the father, and alleging that by reason of his age and mental and physical infirmities he had been defrauded of considerable property and was incapable of conducting his own business. He answered by saying that he was able to look after his own affairs, and charged that the daughter "is afraid that some portion of his estate will be spent on some person other than herself," and that she filed a petition for a guardian because he had planned to leave the state on account of his health, and because he intended to marry a designated woman who lives in Marion County. The petitioner replied by averring that her only purpose is to protect her father from the machinations and schemes of dishonest and designing persons. After hearing the evidence the County Court decided that S. T. Northcutt was not capable of conducting his own affairs and appointed a guardian of his estate. The appointment was set aside upon an appeal to the Circuit Court, and the petitioner is prosecuting the appeal to this court. AFFIRMED.

For appellant there was a brief over the name of *Messrs. Carson & Brown,* with an oral argument by *Mr. John A. Carson.*

For respondent there was a brief with oral arguments by *Mr. Walter E. Keyes* and *Mr. Charles L. Mc-Nary*.

MR. JUSTICE HARRIS delivered the opinion of the court.

1. The Code confers authority for the appointment of a guardian to manage the estates of designated classes of persons, and unless S. T. Northcutt comes within one of those classes, it would not be proper to appoint another person to manage his affairs. Section 1319, L. O. L., provides that:

"The several County Courts, in their respective counties in this state, shall have power to appoint guardians to take care, custody, and management of the estates, real and personal, of all insane persons, idiots, and all who are incapable of conducting their own affairs. * * "

Section 1319 recognizes different classes of mental incapacity just as other sections of the Code acknowledge degrees of mental weakness: *In re Sneddon,* 76 Or. 470, 479 (149 Pac. 527). The language of Section 1319 includes three classes of persons: (1) Insane persons; (2) idiots; (3) all who are incapable of conducting their own affairs. It is not contended that S. T. Northcutt is an insane person or an idiot, and therefore the inquiry is whether he is one of those persons "who are incapable of conducting their own affairs." The legislature has defined the words "insane person," in all statutes relating to guardians and wards, to include "every idiot, every person not of sound mind, every lunatic, and distracted person"; but there is no definition in this jurisdiction of the words "incapable of conducting their own affairs." It becomes necessary, then, to ascertain the meaning of the

words last quoted before attempting to determine whether S. T. Northcutt comes within that class of persons. The term "incapable" signifies: Wanting in capacity for the purpose or end in view; personal lack of ability or power or understanding to perform duties or exercise privileges: Webster's Dictionary; Century Dict.; 22 Cyc. 40. While the definitions given by lexicographers tell us what is meant by the word "incapable" when used in the abstract, yet they do not furnish a gauge by which the degree of mentality possessed by any given person can be compared and measured so that we can know with reasonable certainty when that person has in fact become one of those who is incapable of conducting his own affairs. In California the legislature provided a test by which to determine whether any person is incapable of managing his own affairs. Section 1767 of the Code of Civil Procedure (3 Kerr's Cyc. Codes of Cal.) declares that the word "incapable"—

"shall be construed to mean any person who, though not insane, is, by reason of old age, disease, weakness of mind, or from any other cause, unable, unassisted, to properly manage and take care of * * his property, and by reason thereof would be likely to be deceived or imposed upon by artful or designing persons."

See, also, *Matter of Daniels,* 140 Cal. 335 (73 Pac. 1053).

The Supreme Court of Oklahoma was called upon to construe a statute of that state which authorizes the appointment of a guardian for any person who is "incapable" of managing his property, and that court adopted the California statutory definition, saying in the course of the reported opinion that:

"This definition in our judgment fairly expresses the meaning intended by our legislature": *Shelby* v. *Farve,* 33 Okl. 651, 655 (126 Pac. 764).

Another court has said that:

"A person may be of weak mind, and by reason thereof easily influenced, or dominated by others, so that, in the judgment of men, he ought not to be allowed to manage his affairs": *In re Clark,* 175 N. Y. 139 (67 N. E. 212).

The much cited case of *Emerick* v. *Emerick,* 83 Iowa, 411 (49 N. W. 1017, 13 L. R. A. 757), holds that:

"Ordinarily a person who has sufficient mental capacity to make a valid agreement in regard to his property, and to manage it with reasonable care, unaffected by another's will, should be permitted to retain it."

The California statutory definition as well as the judicial interpretation of statutes like ours are substantially the same and afford a satisfactory test by which to gauge the legal fitness of a person to manage his own affairs; and therefore, if S. T. Northcutt is unable without assistance properly to manage and take care of his property, and would be likely to be deceived, dominated or imposed upon by artful or designing persons, then he is incapable of conducting his own affairs within the meaning of Section 1319, L. O. L. It must be remembered all the while, however, that a guardian cannot be appointed merely because a person does not manage his property judiciously: *Commonwealth* v. *Reeves,* 140 Pa. St. 258 (21 Atl. 315); *Emerick* v. *Emerick,* 83 Iowa, 411 (49 N. W. 1017, 13 L. R. A. 757).

2. S. T. Northcutt has been a resident of Marion County for many years, and now lives in the town of Turner. By his industry, thrift and business judgment he has accumulated considerable property. He is a widower, was about 77 years of age when the petition was filed, and he has cared for the daughter and her children and they have made their home with him during much of the time since she has been divorced.

He has bought and sold lands in Marion County, and about five or six years ago he purchased a large tract of land, and in two or three years afterward sold the property at a profit of about $10,000. One witness referred to him as one who is "quite venturesome for a man of his age, and he is a live—what I would term a live business man," and "wants to be doing all the time." In October, 1913, Northcutt left for New Orleans for the purpose of investigating some property. Upon the advice of a business friend and a banker he took his money in the form of a letter of credit for $6,000 or $7,000 instead of carrying coin with him. While en route on the train he fell in with a woman and two men who were bunco steerers, and, while he denies that he lost his money, nevertheless we shall assume that the sharpers succeeded in relieving him of all or most of the money represented by the letter of credit. Upon his return to Turner, according to the testimony of the petitioner, a man named Harpool interviewed him about investing in land in Arizona, and at some time during the summer of 1914 one Manrod attempted to interest Northcutt in "some kind of a fertilizer" in Mexico. He did not invest, however, in the Arizona land nor in the fertilizer. The daughter testified that her father had been writing poetry ever since she was a little girl. A litterateur acknowledged that, while Northcutt's poetry "is in a class by itself," and while the poems "could be better," and "they won't compare with the best poets," yet "through them all runs a connective chain." The petitioner says that evidence of her father's incapacity is found in the fact that he has been known to arise between 2 and 4 o'clock in the morning and recite poems, and she especially emphasizes instances occurring in 1913 when he would in his imagination address the chairman of a

civic organization known as the Cherrians and re-
hearse poetry, occasionally interspersing the recital
with the use of profane language. It turns out, how-
ever, that the Cherrians had offered a prize of $10 for
the best poem to be submitted, and, in his own peculiar
way, Northcutt was only composing a poem to com-
pete for the $10. At one time he offered a poem to a
moving-picture man to ascertain whether the verses
could be used in the moving-picture business. Only a
few weeks before the filing of the petition Northcutt
went to Missouri and entered into a contract for the
purchase of a section of land. So far as is disclosed by
the evidence, the land is worth what he agreed to pay
for it, and there is not even an intimation anywhere
that he was overreached or dominated or influenced by
anyone. He has also talked about the feasibility of
erecting an electric lighting plant in the town where
the section of land is located. He contemplates a
change of residence with the hope that a change in
climate will relieve him of catarrh. In view of his plan
to move out of the state and buy land in Missouri, and
possibly install an electric lighting plant, Northcutt
intends to call in his loans so that he can use his money
in the contemplated investments. He intends to marry
a woman who is 58 years of age, and with whom he has
been acquainted for about 20 years; and the evidence
shows that she is an estimable and respectable woman,
notwithstanding the opinion of the petitioner to the
contrary. It may be that it is not best for a man 77
years of age to move away from the place where he
has resided for many years and invest his money in
land elsewhere, and possibly build a lighting plant,
and, while one witness thought the withdrawal of his
loans and the purchase of land in another state in-
volved a risk, yet no witness ventured to say that the

proposed investments would prove unprofitable. In spite of his penchant for writing poetry, and although he may have been ambitious to have one of his poems dramatized, he has nevertheless made money even in his old age, because one witness gave it as his opinion that Northcutt "had made more money in the last five years than any man in Turner." Standing by itself, his experience with the three swindlers might suggest the propriety of appointing a guardian, but by the same token it would become advisable to conserve the estates of two witnesses who, when testifying, confessed to having been buncoed at one time, and yet each of them is recognized as a successful business man. There is no intimation of any person overreaching Northcutt in any transaction since 1913.

The petitioner said that she did not think her father was competent to manage his affairs. One witness thought that "it was hardly good judgment" for Northcutt to go away and invest heavily. Upon hearing of the perpetration of the swindle a nephew was of the opinion that Northcutt needed a guardian, but after seeing and talking with his uncle the nephew was convinced that a guardian was not necessary. Mrs. Frances Hubbard thought a guardian was needed, and John M. Watson testified about saying that "I thought it was foolish for a man of his age to speculate in land." In addition to the circumstances already narrated and the opinions of the witnesses mentioned, there was some evidence indicating that Northcutt practiced calisthenics while on the much-talked of New Orleans trip, and there was also some testimony about Northcutt saying that he intended to try to relocate an oil spring which he saw near Salt Lake years ago.

The mayor of Turner testified that Northcutt's business ability "compares favorably with most any man."

The cashier of the Turner State Bank said that North-cutt was competent, and Mr. McKinney thought that he was about as able to transact business as the average man. H. W. Smith stated that Northcutt was as capable of transacting business as the average man of his age. E. C. Baker, a hotel-keeper, considered "him one of the shrewdest men in Turner when it came to business." J. T. Cannon testified that: "I consider him as shrewd a man in business as there is in the country." Eight other witnesses said that he was competent to transact business. And finally Dr. L. F. Griffith, who has been employed at the state hospital for the insane since May, 1891, testified that while, generally speaking, it was not good business for an old man to engage actively in business, yet, after making an examination, he found Northcutt "quite remark-ably preserved for a man of 77 years of age, both physically and intellectually," and that he was competent to transact business.

Without the evidence of the fraud practiced upon Northcutt in 1913, the records would be barren of any suggestions looking toward the advisability of appointing a guardian, but it is worthy of notice that no attempt was made to appoint a guardian upon his return in 1913, and it was not until a year afterward, when he planned to marry and talked of moving away and investing in land in Missouri, that the petition was filed. Moreover, some information of the motives prompting the guardianship proceedings is afforded by the frank admission of the petitioner that she objects to her father marrying the lady of his choice. She has no right, however, to say that her father shall not marry nor to say whom he shall marry: *Hogan* v. *Leeper*, 37 Okl. 665 (133 Pac. 190, 47 L. R. A. (N. S.) 475). It may not be judicious for Northcutt to marry,

or to move away, or to invest his money in Missouri, but he had a right to do so unless for some reason he is incapacitated. If men of competent judgment and who have known him for years are to be credited, then at the time of the trial Northcutt was not an incapable person within the meaning of the statute, even though his doings betray some of the foibles which frequently accompany old age.

The decree of the Circuit Court is affirmed.

AFFIRMED.

Mr. Chief Justice Moore, Mr. Justice McBride and Mr. Justice Bean concur.