Argued at Pendleton, May 3, affirmed June 8, 1920.

## In Re McILROY.

## McILROY v. McILROY.

(190 Pac. 309.)

**Insane Persons—Guardian of Incompetent—Petition Need Only Follow Statute.**

1. Petition for appointment of guardian for an alleged incompetent is sufficient if it follows substantially the wording of Section 1319, L. O. L., and it is not necessary to allege all facts and details tending to show the individual is incapable of conducting his own affairs.

**Insane Persons—Evidence—Guardian and Ward—Incompetency.**

2. On a son's petition, under Section 1319, L. O. L., for appointment of guardian for his ninety-one year old father, evidence *held* to show that the father was incapable of conducting his own affairs, and to call for guardianship to manage and preserve the estate.

[Presumption as to continuance of permanent insanity, see notes in 4 Ann. Cas. 491; Ann Cas. 1912C, 388.]

From Union: JOHN W. KNOWLES, Judge.

In Banc.

This proceeding was initiated in the County Court of Union County, to have a guardian appointed for the defendant, James McIlroy, father of the petitioner. The petition alleges that James McIlroy has in his own right about $15,000 in Liberty bonds, notes, certificates of deposit, cash and other property to the value of about $2,000; that he lives alone and is unable to look after his own business; that on the —— day of May, 1919, he drew his money and securities from the First National Bank of Elgin and put them away somewhere about his house, forgot where he hid them and reported the loss to many people around the town; that it is unsafe for him to have any money around the house, as it subjects him not only to loss but to danger of violence and robbery; that he is almost blind and his mind and memory are greatly weakened by age; that he is incapable of conducting his own affairs and maintaining himself; that he refuses to live with or make his home with any of his relatives; and that unless a guardian is appointed to care for him his property will be lost and dissipated.

A restraining order was granted and a citation issued to James McIlroy. The defendant appeared by his attorney and filed motions to strike out the petition upon the ground that it did not state facts sufficient to show that he was wasting his estate or was incompetent to manage his business, and to dissolve the restraining order, both of which were overruled. The defendant filed an answer denying the material allegations of the petition and alleging that the proceeding was prompted by malice and an attempt on the part of the petitioner to prevent him from conducting his own affairs and to embarrass

him in the disposition of his property; that he had acquired all his property by his own industry and ability; that he has always conducted his own business and is still able to do so; that he has relied upon his son William McIlroy and the latter's wife to attend to his affairs as he directs; and that he is able and competent to manage his property and business and does not waste anything. He prayed that the proceeding be dismissed and the restraining order dissolved. The reply denied all the new matter in the answer.

A trial was had, testimony was taken and the court found that the defendant is about ninety-one years of age; that his eyesight is defective and his hearing greatly impaired; that he is suffering a deterioration of intellect, and senile dementia; that he is unable to conduct his own affairs and that he requires the services of a guardian for his person and estate. The court appointed F. L. Meyers as his guardian upon the giving of an approved bond for $15,000 by Meyers.

An appeal from that decision was taken to the Circuit Court. The case was there tried *de novo* upon the record and transcript made in the County Court, and the Circuit Court made findings of fact and rendered a decree affirming the decision of the County Court and its appointment of F. L. Meyers as guardian. The defendant appeals, claiming that the Circuit Court erred in not discharging the defendant from the custody of a guardian, in not releasing his property, in decreeing that he is incapable, or by reason of his age not competent to manage or control his business affairs, and in confirming the appointment of a guardian to look after his person and estate.          AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Charles H. Finn.*

For respondent there was a brief and an oral argument by *Mr. John S. Hodgin.*

JOHNS, J.—1. The petition is based on Section 1319, L. O. L., which provides that the several County Courts shall have power to appoint guardians to take care of the estates, real and personal, of all who are unable to manage their own property and business. In this kind of a pleading it is sufficient if the petition follows substantially the wording of the statute. It is not necessary to allege all of the facts and details tending to show that an individual is "incapable of conducting his own affairs": *Dickenson* v. *Henderson,* 90 Or. 408 (176 Pac. 797). In the case of *In re Northcutt,* 81 Or. 646 (148 Pac. 1133, 160 Pac. 801), it was held that if Northcutt were "unable without assistance properly to manage and take care of his property and would be likely to be deceived, dominated or imposed upon by artful or designing persons," he would be incapable of conducting his own affairs, within the meaning of Section 1319, L. O. L.

The testimony shows that the defendant is between ninety-one and ninety-three years of age; that he earned and accumulated funds and property after he was seventy years old; that he was divorced from his wife about twenty years ago; that he was the father of a large family, and all but one of the children took the part of the mother; that he lived alone in his own building at Elgin; that he did his own cooking and looked after his own wants; and that physically he was quite active for a man of his age.

It also appears that until recently both his hearing and eyesight were good; that he read the newspapers and in large measure attended to his own business; that when the petition was signed his hearing was defective and his sight was very poor; that he had difficulty in recognizing his friends except by their voices, and that they had to speak in fairly loud tones in order for him to hear at all.

In recent years he had his money, bonds and securities on deposit in an Elgin bank, and its officers looked after his business. His memory became very defective and he had somewhat of a delusion about his children, imagining that they had robbed him in a business transaction long past. He had acquired the habit of taking his assets from the bank, hiding them somewhere in the house where he lived and later returning them to the bank. He did this several times in the four or five months next preceding the filing of the petition. Among his assets he had $5,000 in Liberty bonds that were "payable to bearer" and the title would be passed by delivery, and $5,400 in certificates of deposit in the Elgin bank, payable to his order. The testimony is undisputed that he took all of these papers from the bank, placed them in his kitchen stove, where they would be destroyed by a brisk fire, later concealed them elsewhere and forgot where he put them. He then notified some of his neighbors that he had been robbed. Six or seven of them joined in a diligent search of his premises, including the stove and an old mattress where he claimed he had put his papers. He also told them that at times he placed his valuables in the ash-box of his heating stove. After a thorough investigation lasting about an hour and a half nothing was found, and for want of a light the

searchers quit until the next morning. The bonds and deposit slips were later discovered in an old trunk, where the defendant had evidently placed them.

'Several witnesses were called to testify concerning the defendant's actions, conduct and capacity to transact business and care for his property; and there was some evidence on his part, especially that of his son William, tending to show that he was competent and qualified to look after his business affairs. He was present at the hearing in the County Court, but was not called as a witness. The testimony was taken before the county judge, who had more or less personal knowledge of the surrounding circumstances. His findings were later approved by the Circuit Court.

2. The strenuous objection of the son William to the appointment of a guardian was upon the ground that the father would not receive proper care and attention and that the guardian would appropriate the estate and dissipate it in costs and expenses. The purpose of the statute is to provide for the appointment of a custodian for anyone who is "incapable of conducting his own affairs." After a careful reading of the testimony we are satisfied that it is prudent and best for his own interests that a guardian be appointed for the defendant to manage and preserve his estate. The man named is the cashier of a bank at La Grande and is under a sufficient bond. His conduct and management are subject to the approval of the County Court, and it must be assumed that he will render a correct accounting of his trust. It is apparent that the defendant cannot manage his property without assistance, and there is serious danger that without a guardian he might

be "dominated or imposed upon by artful or designing persons."

The decree is affirmed.                    AFFIRMED.