ISAAC CROSSAN et al., Appellants, v. GEORGE
CROSSAN et al.

### Division Two, October 27, 1902.

1. **Will Contest:** WEIGHT OF EVIDENCE: PROVINCE OF COURT AND JURY. Where there is substantial evidence upon which to base the verdict of the jury in a will contest, it is the province of the jury to decide on which side is the weight of the evidence.

2. **Verdict:** WEIGHT OF EVIDENCE: GENERAL RULE. The appellate court does not weigh the evidence in law cases where there is competent evidence to sustain the verdict.

3. **Exclusion of Evidence:** PRACTICE. Appellant had twice offered, without objection, evidence that testatrix had stated that she had paid for land owned by one of the contestees, and on its being the third time offered the court inquired its purpose, and to the explanation of counsel replied, "I expect it is objectionable." No motion had been made to exclude the testimony, and no direction was given the jury to disregard it. *Held,* first, that this testimony, even if competent, was not taken from the jury in such an authoritative way as to require them to disregard it, and, therefore, there was no such exclusion of evidence as amounted to reversible error. *Held,* second, that the evidence was incompetent, since the ownership of this property was not an issue in the suit to set aside the will. Besides, the evidence was incompetent because the conveyance was made at a time when all parties admit testatrix was of sound mind.

4. **Will Contest:** CAPACITY OF TESTATOR TO CONDUCT OTHER BUSINESS. The maker of a will is not required to have capacity "to control and conduct her ordinary business affairs," but "sufficient understanding to comprehend the nature of the transaction that she was then engaged in, the nature and extent of her property, and to whom she desired to give it and was giving it, without the aid of any other person."

Appeal from Nodaway Circuit Court.—*Hon. Gallatin Craig,* Judge.

AFFIRMED.

*S. R. Beech, Edwin Crossan and John Kennish* for appellants.

(1)    The court rejected proper and legal evidence, offered by the appellants, to-wit:    The evidence of Mrs. Mathers, a daughter, that her "mother claimed in 1892 that real estate in the village of Wilcox, Missouri, to which George held a deed in his name and claimed, was hers," to show that her mind was diseased, or, that she thought George had robbed her; and the evidence that George, one of the respondents, declared in 1898 that his mother was demented.    Also that George, one day after his mother died, offered Ed Crossan (one of appellants) $600 "if he would stand by the will," to show that George entertained fears of a contest, or, for the purpose of "cutting Ike out."    Gordon v. Burris, 141 Mo. 602.    (2)    The verdict was against the evidence and the weight of the evidence.    Where the verdict is so clearly wrong under the evidence and law, the court should not hesitate to set it aside, and in such case, the Supreme Court reviews and considers the evidence.    Norton v. Paxton, 110 Mo. 456; Gordon v. Burris, 141 Mo. 603; State ex rel. v. Guinotte, 156 Mo. 514; Plow Co. v. Sullivan, 158 Mo. 440; McFadin v. Catron, 138 Mo. 209; Riley v. Sherwood, 144 Mo. 366; Cash v. Lust, 142 Mo. 631.    (3)    The court erred in refusing appellant's instruction 3, as asked, and in giving it as modified by the court.    Riggin v. Westminster College, 160 Mo. 570.    In Benoist v. Murrin, 58 Mo. 322, in its definition of "capacity," the court says:    "And if a person has sufficient understanding and intelligence to understand his ordinary business," and same definition is approved in Harvey v. Heirs of Sullens, 56 Mo. 379, Jackson v. Hardin, 83 Mo. 180; Myers v. Hanger, 98 Mo. 439; Carl v. Gobel, 120 Mo. 291; Farmer v. Farmer, 129 Mo. 537; Norton v. Paxton, supra.

*J. H. Sayler* and *E. A. Vinsonhaler* for respondents.

(1) This court sometimes has to interfere to sustain wills. No case is found where the court has interfered with a verdict in favor of a will on the sole ground that it was against the weight of the evidence. (2) It is certainly the rule in this State, sustained by abundant authority, that a testatrix need not be able "to control and conduct her ordinary business affairs" in order to be competent to make a will The court very properly modified this instruction. Von De Veld v. Judy, 143 Mo. 348; Brinkman v. Rueggesick, 71 Mo. 553. This instruction follows the one approved in Campbell v. Carlisle, 163 Mo. 643. And even if there be error in instructions, when the verdict is manifestly for the right party the case will not be reversed. Von De Veld v. Judy, 143 Mo. 367.

GANTT, J.—In this proceeding the will of Mrs. Rebecca Crossan of Nodaway county was contested, and sustained by the verdict of a jury, which was also approved by the circuit court. The contestants have appealed.

The testatrix was quite an old lady at the time she executed her will. All of the witnesses concur in the view that naturally she was a woman of great firmness of character, of fine common sense and unusual business capacity and shrewdness, up to the year 1895, during which year she became very much enfeebled by erysipelas or some other acute disease, which totally destroyed one of her eyes and caused most excruciating pain in her head and rendered the sight of her other eye very dim.

On the part of the contestants the evidence tended to prove that her mind was unbalanced about this time, and that she never after that illness had sufficient mental capacity to make a will.

This evidence came chiefly from the contestants and their children.

The evidence of the contestees was to the effect that she was so enfeebled at that time that her children prevailed on her to quit her housekeeping and to live with her children. It appears she visited one of her sons, William, at Paola, Kansas, but became so dissatisfied with her surroundings in that State that they brought her back to Missouri. She then employed different families to live with her in her own house in Maryville, and the evidence of the members of these families and that of apparently other disinterested neighbors tended to show that from the time of her recovery from her illness at that time until in January, 1899, she managed her own affairs about her home, and kept her own bank account, and her son, George, one of the contestees, looked after her other business, managing it for her very successfully; that she was perfectly sane.

In January, 1899, she was again very sick. Had bronchial pneumonia and kidney trouble. The physician, Dr. Goodson, who attended her the first week of her illness, and her children the contestees, testify that she was delirious from her disease, but this physician says her delirium was the result of her disease, and not insanity. Dr. Goodson's brother was taken very ill about this time, and he was compelled to cease his visits, and then Dr. Dean was called. Dr. Dean testified she had pneumonia of the left lung, congestion of the kidneys and her mind was wandering. She would answer intelligently at first and then would drift off on to some foreign subject. Had hallucinations as to her room and her surroundings. He thought she was mentally unbalanced. Formed his opinion in part from what one of her daughters, Mrs. Logan, one of the contestants, told him. Dr. Dean ceased his visits about the twenty-third of March, when she had recovered sufficiently to be moved to the home of her son George. From that time on she continued to improve and did not require a physician or special nurse until sometime in July.

On May 17, 1899, she executed this will.

Crossan v. Crossan.

As to her condition at that time, Dr. Goodson, Warren Johnson and Harvey Hall, and others, testified.

Dr. Goodson, who had been her medical adviser, testified that she made a splendid recovery from the illness for which he had treated her in January, and "was mentally sound, all right."

Harvey Hall had known her ten or twelve years in Maryville. Lived about one block from her. Saw her often but had no intimate acquaintance with her. Spoke to her nearly every day. Talked to her for about one half an hour before she signed the will. She talked all right and acted naturally and all right. Saw nothing out of the way with her. Nothing different in her mental condition from what it had been for some time, except she was much better than when he had seen her before.

Mr. Johnson, who drew the will, had met her often, when she would come to the clerk's office to get her pension vouchers. She was quite weak when she made the will, but she seemed to know what she was doing, seemed to be rational. Saw and heard nothing to the contrary.

Mr. and Mrs. Van Steenburg, who lived in Mrs. Crossan's house, testified that while she was weak from her sickness, she was sound in mind and mentally all right. Other neighbors testified to her sanity.

On the other hand, the contestants testified that she was demented and that she had a great fear of her son George; that he ruled her with an iron will, but nearly all admitted at some point in their evidence that George Crossan was in fact a most dutiful son and had done more for the protection of his mother's estate than any one of her children. And the disinterested testimony was that he was gentle and thoughtful and affectionate to his mother.

As to the will itself, it appears that it was quite similar to one she had made in the lifetime of her husband. In that,

she had given a life estate to her husband, and made certain provisions for each child, but in the last, as her husband had died, the life estate was omitted.

As to the discriminations against some of her children, the evidence disclosed that the family formerly lived in Illinois and that Edwin had sued' his father and much bitterness had resulted. He obtained judgment and it absorbed his father's homestead. At first she seemed inclined on this account not to give Edwin anything but when she directed this will to be drawn, she said that perhaps he had not received in the lawsuit all he had loaned his father, and as the others would have enough she directed he should have $500.

As to Isaac. It appears she had built a house at the cost of $350 on his land, and when she concluded to go to Kansas he would allow her only $100. She always said Isaac had cheated her in this transaction, and she charged him interest on the difference between what he gave her, and what her house was worth, and she gave him only $200, She said also, which seemed to be uncontradicted, that Isaac and her two daughters were all well off, whereas John was poor and had a large family, and George had stayed with her and cared for her more than any of them; accordingly she gave John and George each $1,000.

She said William had been a good son to her and helped her lots, but he was a good lawyer, and she gave him $800. She gave each of her two daughters $300, and one-half of her wardrobe, each. The residue she directed to be divided in this same proportion; among all of her children, save and except a provision for burial expenses, and a tombstone to cost not exceeding $300.

I. The first proposition advanced is that the verdict was against the weight of the evidence. That there was ample evidence to justify the verdict of the jury, as to Mrs. Crossan's testamentary capacity, does not admit of a doubt. When this

is the case, it is the province of the jury to determine the fact. Indeed, leaving out the testimony of those whose interest it was to set aside the will, the great weight of the evidence was that Mrs. Crossan was competent to make a will and knew how she was disposing of her estate. This is not a case in which the verdict is based upon no substantial evidence in which this court would be justified in substituting its judgment for that of the jury, and the supervising judgment of the circuit court who heard the testimony. If there was ever a case when the jury should have been left to determine the credibility of the witnesses, this was one. Even at this distance, it is not difficult to discern that personal interest, and unfortunate family dissensions, biased and affected the testimony of the witnesses. The jury who saw these witnesses and observed their manner of testifying and their exhibition of animus toward the beneficiaries of the testatrix, was the proper body to weigh their evidence, and it is not our province to do so. [Bryan v. Wear, 4 Mo. 106; Wolff v. Campbell, 110 Mo. 120; Gordon v. Burris, 141 Mo. 614-15.]

While this court will interfere to set aside a verdict in a will contest where there is no evidence to sustain it, just as in other civil actions, we will not weigh the evidence in law cases where there is competent evidence to sustain that verdict. [Young v. Ridenbaugh, 67 Mo. 574; State ex rel. v. Guinotte, 156 Mo. 520-21.]

II.   Error is assigned on the exclusion of certain evidence offered by contestants,

First, that the court erred in excluding the evidence of Mrs. Mathers that her mother said in 1892 that "every dollar in the Wilcox property that George has in his name is mine and belongs to me." The law requires the appellants to bring to this court a correct abstract of the testimony, especially when appellants claim the whole evidence is insufficient to sustain the verdict. In accordance with this statute, plaintiffs have filed an abstract, which shows that Mrs. Logan, one

of the contestants, testified to this statement, and it went to the jury without objection.

When later in the case Mrs. Mathers also testified: "Mother," talking (in 1892) of the Wilcox property, "said she allowed that the Wilcox property that George owned was more hers than his, because her money paid for it." No objection was made to this by counsel for contestees, but the Court inquired, "On what theory is it offered?"

Counsel for defendant then said, "If you were trying to set aside a deed that might be proper."

The Court: "I don't know the theory."

Counsel for plaintiffs: "We offer it to bear upon the condition of her mind at that time, taking it for granted that it is George's property."

By the Court: "Your notion is to show that she claimed other people's property."

"Yes, sir."

By the Court: "I expect it is objectionable."

No motion was made to exclude, and no direction given the jury to disregard it. It had already gone to them twice without objection. For two reasons, we think there was no reversible error in this ruling of the court. It was not taken from the jury in such an authoritative way as to require them to disregard it, either at the time or by a later instruction. But, secondly, it was clearly incompetent. The ownership of the Wilcox property was not in issue in the case, and, moreover, there is not a scintilla of evidence in this entire record that prior to 1895, Mrs. Crossan, the testatrix, was of unsound mind. The plaintiff's began with the severe illness of 1895 as the point when her mental powers began to fail. This statement made long prior to any illness and when they all admit she was of sound mind did not tend to prove any issue in the case, and should have been excluded in no uncertain language. Its only effect could have been to prejudice the jury against the son whose title to the property could not

be affected by these ex parte statements of his mother in his absence. In no aspect of the case was it competent. Its real purpose is not difficult to be seen.

Secondly, it is said the court erred in excluding evidence that George Crossan, one of the defendants, after his mother's death, offered Ed Crossan, one of plaintiffs, $600, "if he would stand by the will." Here again the record shows that George Crossan in his cross-examination testified positively and unequivocally, "I did not go down to Isaac's the day I filed the will for probate, *and offer Ed* $600 *if he would stand by the will.*" No objection was made, and it was never excluded. It is true, when counsel again repeated the same question, he disclaimed any purpose of proving an offer to compromise, but said he offered it *"to reflect on George Crossan's* idea of the goodness of the will; *to show a sort of confession* upon his part."

The Court: "If that is the object, the objection will be sustained." But the witness answered, *"No, sir; I never said a thing of the kind."* The witness was not rebuked, and the evidence was not withdrawn from the jury, and no one testified that he ever made such an offer. Surely counsel do not seriously contend that a solemn verdict and judgment should be reversed upon such a state of the record.

III. Again it is urged as error that the court amended the third instruction asked by contestants by striking out the words, "to control and conduct her ordinary business affairs," and the instruction as asked was in the words following:

"3. In determining the issue of sufficient soundness of mind or testamentary capacity possessed by the testatrix, to make a will, before you can find in favor of the proposed will, you must believe from a preponderance of the evidence, that, at the time of the signing and execution thereof, the said testatrix had sufficient understanding (*to control and conduct her ordinary business affairs and*) to comprehend the nature of the transaction that she was then engaged in, the

nature and extent of her property, and to whom she desired to and was giving it, without the aid of any other person, and unless the defendants have shown by such preponderance of evidence that she did possess all of these requisites, you should find this issue in the negative, and against the will."

The modification made by the court was the striking out of the words embraced within the parenthesis, and then giving it, as amended, to the jury.

In Brinkman v. Rueggesick, 71 Mo. 553, Judge NAPTON, speaking for the whole court, quoted with approval Judge REDFIELD's conclusion as to the extent of mental capacity required to make a will, as follows:

"The result of the best considered cases on the subject seems to put the quantum of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction, or in popular phrase, that the testator should at the time of executing the will, know and understand what he was about. It is sufficient if the testator knew what he was doing and to whom he was giving his property."

Judge NAPTON then proceeds to say, "And it is conceded in most of the cases that a man may be capable of making a will, and yet incapable of making a contract or managing his estate." Citing 2 Redfield on Wills, ch. 4, sec. 10; Thompson v. Kyner, 65 Pa. St. 368; Stubbs v. Houston, 33 Ala. 555.

Brinkman v. Rueggesick was expressly followed and approved in Couch v. Gentry, 113 Mo. 248, in which a more rigid rule was disapproved, and in Maddox v. Maddox, 114 Mo. 35, and in the following other cases: Jackson v. Hardin, 83 Mo. 175; Farmer v. Farmer, 129 Mo. 538.

The question is, was it error to strike out those words?

Unquestionably, as given, it is in strict conformity with the ruling in Brinkman v. Rueggesick, and Campbell v. Carlisle, 162 Mo. l. c. 643. In Von de Veld v. Judy, 143 Mo.

Crossan v. Crossan.

l. c. 369, Judge SHERWOOD said: "The admission that Smith stood ready to establish did not go to the capacity of Judy to *make a will,* but to his competency to *make a contract,* and our decisions all show that a man may be *entirely competent as to the former,* while incompetent as to the latter."

We think the instruction as given, requiring the jury to find that "at the time of signing and executing the will, the testatrix had sufficient understanding to comprehend the nature of the transaction she was engaged in, the nature and extent of her property, and to whom she desired to, and was giving it, without the aid of any other person," prescribed every requisite as to mental capacity which the law of this State exacts, and, hence, there was no error in amending the instruction as the court did. [McClintock v. Curd, 32 Mo. 411; Fulbright v. Perry County, 145 Mo. 442.]

IV. Instruction number 4 placed the burden of showing undue influence on the contestants. They voluntarily assumed this burden and there is no such showing of confidential relations on the part of George as to raise a presumption of undue influence (Campbell v. Carlisle, 162 Mo. 634; Maddox v. Maddox, 114 Mo. 35), and the instructions on that subject were but a repetition of those often approved by this court, and no good purpose will be subserved by their needless repetition in this opinion.

The case was fairly submitted to the jury and by their verdict they have said the testatrix had the testamentary capacity defined in the instructions and that her son George Crossan did not exercise an undue influence over her to procure the will to be drawn as it was.

The judgment was clearly for the right parties and it is affirmed. All concur.