Argued at Pendleton October 31, 1918, reversed and remanded January 21, rehearing denied May 13, 1919.

## In Re STURTEVANT'S ESTATE.
## STURTEVANT v. STURTEVANT.

### (178 Pac. 192.)

**Wills—Probate—Burden of Proof.**

1. Where a will probated in common form has been attacked by direct proceedings, proponents must re-probate the will by original proof, as if no probate had been made, the burden of proof being upon proponents.

**Wills—Undue Influence—Burden of Proof.**

2. The burden of establishing that a will has been executed because of undue influence is upon the party alleging it.

**Wills—Mental Capacity—"Delusion."**

3. An alleged delusion that an excluded son had buried a large sum of money which he had embezzled from testator was not shown where there was some evidence to support testator's belief, "delusion" being a conception originating spontaneously, without evidence to support it, and one that can be accounted for on no reasonable hypothesis.

**Wills—Delusions—Evidence—Sufficiency.**

4. Where a will was contested on the ground that testator labored under a delusion that contestant had buried a large sum of money which he had embezzled from testator, evidence *held* not sufficient to show the existence of such delusion.

**Wills—Testamentary Capacity—Persons Under Guardianship.**

5. A person under guardianship does not on that account lose his right to make testamentary disposition of his estate if he retains sufficient mental capacity to execute a will.

**Evidence—Testamentary Capacity.**

6. Under Section 727, L. O. L., witnesses who were intimate acquaintances of testator may express their opinion as to his sanity and give reasons therefor, but they cannot decide whether or not he had capacity to make the will, as that would invade the province of the court.

**Wills—Contests—Evidence—Relevancy.**

7. Where a will is contested on the ground of want of capacity, contestant alleging that testator labored under a delusion that his money had been embezzled by a son, evidence as to the reputation for honesty of such son was irrelevant.

**Wills—Testamentary Capacity—Evidence—Sufficiency.**

8. Where a will is contested on the ground of want of capacity and undue influence, positive testimony of the subscribing witnesses, showing a testamentary capacity, overcomes opinion evidence by other witnesses, showing eccentricities of actions, writings, and speech.

**Wills—Mental Capacity—Evidence—Sufficiency.**

9. Where a will was contested on the ground of mental incapacity, evidence *held* to show that testator, although he was old and infirm and not so bright as formerly, retained sufficient mentality to make his will.

**Wills—Contests—Undue Influence—Evidence.**

10. In a suit by testator's son to set aside a will which failed to make provision for him, and made another son the chief beneficiary, evidence *held* not to sustain a finding of undue influence.

## ON PETITION FOR REHEARING.

**Wills—Testamentary Capacity.**

11. One has sufficient testamentary capacity to make a will if he knows what he is doing and to whom he is giving his property, though he may be incapable of making a contract or managing his estate.

**Wills—Testamentary Capacity—Delusions.**

12. The mere fact that testator had delusions upon some subject does not show want of testamentary capacity, if these delusions did not affect his mind in making his bequests.

**Wills—Testamentary Capacity—"Delusion."**

13. A "delusion" is a fixed belief in a proposition which has no foundation in evidence and which is so extravagant that a reasonable man would not adhere to it.

**Trial—Setting Aside Verdict—Evidence.**

14. A verdict must stand if there is any evidence to sustain it.

**Wills—Validity.**

15. Testator has perfect legal right to dispose of his estate as he chooses.

**Wills—"Undue Influence."**

16.  Kind treatment and even reasonable solicitation do not constitute "undue influence."

**Wills—Testamentary Capacity—Old Age—Mental Impairment.**

17.  One who retains sufficient independent mentality to know what he wishes to do with his property and to know that will expresses his desires may make will, though suffering from mental impairment as result of old age and disease.

> [As to presumption and burden of proof in case of a disputed will, see note in 31 **Am. St. Rep.** 680.]

From Umatilla: DALTON BIGGS, Judge.

Department 1.

On July 18, 1914, the County Court of Umatilla County took proof of a will of A. J. Sturtevant of date November 5, 1913, in common form, and admitted it to probate, appointing an executor and taking and approving his bond.  On September 16th following, two of the decedent's grandchildren, to whom his deceased son was father, appeared in the County Court by their mother and guardian, Myrtle F. Carnes, to contest the validity of the will thus proved.  After alleging their relationship and that of other persons named in the will to the decedent, under their first cause of contest the contestants allege:

"That said Andrew J. Sturtevant at the date of his death was of the age of about 83 years, and that at the time of the execution of said pretended will and for long prior thereto and until his death he was not of sound or disposing mind or memory, and that in consequence of illness, both physical and mental, and in consequence of old age, and in consequence of paralysis long continued, and other causes, his brain was diseased, his mind was seriously impaired, and his memory substantially destroyed, and that at the date of said will and for a long time prior thereto and thereafter up to the time of his death, the said Andrew J. Sturtevant was incapable of exercising any judgment over his property, or any other matter of im-

portance, and was at the date of said will and long prior thereto, and up to the time of his death incapable of making a valid will.

"That these contestants are by the terms of said pretended will cut off with only $2.50 each, and are thus defrauded of their patrimony, and that respondents are the beneficiaries thereby and thereunder."

Their second charge reads thus:

"That at the date of said alleged will and for a long time prior thereto, and thereafter up to the time of his death, the mental condition of said Andrew J. Sturtevant was such that he was easily persuaded in his course of conduct, and that said will was fraudulently obtained by undue influence exercised upon and over the said Andrew J. Sturtevant by respondent Mark A. Sturtevant and Alma Sturtevant, and perhaps other parties acting for them and in their interest, and that said will was not and is not in truth or in fact the will of said Andrew J. Sturtevant.

"That said pretended will was drawn from a memorandum in writing furnished to said Andrew J. Sturtevant by other persons to these contestants unknown, and that said Andrew J. Sturtevant did not understand when said pretended will was executed that he was making a last will and testament, and that his mind was then and there so feeble and so unsound that he had no ability to distinguish between a last will and testament and a petition for the removal of a guardian."

It is also averred in the third place that:

"Andrew J. Sturtevant at the time of the execution of said pretended will and for a long time prior thereto, and thereafter up to the date of his death, was a person adjudged by the courts of the State of Oregon to be incapable of conducting his own business, and was under guardianship, and that in truth and in fact said Andrew J. Sturtevant at the date of the execution of said alleged will and for a long time prior thereto, and thereafter until the time of his death, was to all intents and purposes an insane person and in-

capable of transacting any business of importance, and incapable of executing a last will and testament, and that said pretended will was not the product of his own free agency."

Lastly they said:

"That at the time of the execution of said alleged will and for a long time prior thereto, and thereafter up to the time of his death, said Andrew J. Sturtevant was possessed of and influenced by a delusion, which delusion colored, moulded and affected all his actions, his attitude and his sentiment toward these contestants, his grandchildren; that said delusion was a belief which he entertained that the father and mother of these contestants had a large amount of money belonging to him, the said Andrew J. Sturtevant, buried, and that the father of these children in his lifetime, and the mother of these children thereafter, was withholding from him, the said Andrew J. Sturtevant, a large amount of money belonging to him, and that said delusion caused these contestants, his grandchildren, to be substantially cut off from all benefits under said pretended will."

The matter in the contesting petition was traversed by Mark A. Sturtevant, the principal beneficiary, and by his wife and daughter Faye, who also took under the contested will.

Further answering the contestants' petition, the parties named made appropriate averments showing the establishment and probate of the will in question and alleged that it was the last will and testament of A. J. Sturtevant, deceased. The new matter in the answer was controverted by the reply. The County Court heard the testimony on the issues thus framed and set aside the will. Identical action was taken by the Circuit Court on appeal and the proponents have appealed to this court.    REVERSED AND REMANDED.

92 Or.—18

For proponents-appellants there was a brief and an oral argument by *Mr. James A. Fee.*

For contestant-respondents there was a brief over the names of *Mr. Stephen A. Lowell, Mr. W. M. Peterson, Messrs. Raley & Raley, Mr. C. M. White* and *Mr. Frederick Steiwer,* with oral arguments by *Mr. Lowell, Mr. James H. Raley, Mr. Peterson* and *Mr. White.*

BURNETT, J.—It appears that A. J. Sturtevant, the deceased, was a merchant and land owner at Pilot Rock in Umatilla County. By close attention to business through a series of years he had accumulated a fortune in excess of $40,000. He died on July 3, 1914. On September 27, 1910, on petition of his son, Mark Sturtevant, the County Court of Umatilla County made the following order:

"Now on this day the duly verified petition of Mark Sturtevant and L. E. Roy, praying for the appointment of a guardian of the person and estate of A. J. Sturtevant, coming on to be heard; and it appearing to the court that the said A. J. Sturtevant is personally present in court together with his attorney, Will M. Peterson, an attorney at law of this court, and that the said A. J. Sturtevant has this day filed an answer to the said petition with the clerk of this court in which he admits that there should be a guardian forthwith appointed to look after his person and estate, and suggesting that T. J. Tweedy, a resident of Pendleton, Umatilla County, Oregon, and an old acquaintance and friend, be appointed; and the court having fully considered the said petition and the answer thereto, and having personally talked with the said A. J. Sturtevant and fully realizing the situation relative to his condition of mind and body, and the large estate which he owns, and being fully satisfied after a full hearing and consideration of all matters appertaining to the application for the appointment of a guardian, and being satisfied that a guardian of his

person and estate should be forthwith appointed by
this court.

"It is now therefore considered, ordered, adjudged
and decreed that A. J. Sturtevant is a person incapable
of conducting his own affairs, and of properly caring
for his health and general welfare; that a guardian of
his person and estate should be forthwith appointed
by this court; that T. J. Tweedy, a competent and
qualified person, be, and he is hereby, appointed
guardian of the person and estate of A. J. Sturtevant,
and letters of guardianship shall issue out of this
court to him as such upon his filing with the clerk of
this court a bond with surety, first approved by this
court, in the sum of Five Thousand ($5,000.00) Dol-
lars, conditioned as by law required."

At the time of his death the decedent was approxi-
mately eighty years of age. His wife died in 1910
prior to the appointment of his guardian. The aged
couple had two sons, one of whom, Clark Sturtevant,
died in 1906, leaving a widow who three years after-
wards married Owen Carnes. The deceased son also
left two children, contestants here, Vivian Sturtevant,
who died during the pendency of this proceeding, and
a son, Lowell Sturtevant. The testator likewise had
another son, Mark Sturtevant, the principal bene-
ficiary in the contested will. By a former wife Mark
had two sons, Clark and Andrew Sturtevant, and two
daughters, Faye and Carrie Esther, each of the daugh-
ters being a beneficiary.

Mark Sturtevant married Alma, his present wife, in
October, 1910. She was adjudged insane on January
30, 1915, and was not present at the hearing below.

Condensed to its lowest terms, the attack on the will
in question is twofold: (1) That by reason of insanity
the testator was incapable of making a valid will;
and, (2) that the disposition of his property embodied
in the instrument in question was brought about by

undue influence exercised over him by Mark Sturtevant and wife, and others acting in their interest. It is true, something is said about the testator's having been controlled by a delusion, but that is properly classified under the charge of insanity or want of testamentary capacity.

1. From the early case of *Hubbard* v. *Hubbard*, 7 Or. 42, to the present time the rule has been that where a will has been probated in common form and its validity has been attacked by direct proceedings, it lies upon the person propounding the will to re-probate the same by original proof in the same manner as if no probate thereof had been had, except as to such matters as are admitted by the pleadings, and in such a proceeding the *onus probandi* to show testamentary capacity of the decedent and formal execution of the instrument is upon the party propounding the will. Among the latest expressions on this subject comes one from the pen of Mr. Chief Justice McBRIDE in *King* v. *Tonsing*, 87 Or. 236 (170 Pac. 319), in these words:

"The burden of proof was upon the proponent to establish the testamentary capacity of the deceased by the preponderance of testimony."

In a sense, a jarring note in the harmony of our decisions on this subject is found in some language used in *In re Will of Susanna Dunn*, 88 Or. 416 (171 Pac. 1173), where it is said:

"The contestants have not established by a preponderance of the evidence that the testator was mentally incompetent or that any undue influence was used to bring about the execution of the will in controversy."

As shown in *Simpson* v. *Durbin*, 68 Or. 518 (136 Pac. 347), the burden of establishing the allegation that the contested will was the product of undue influence is

upon the contestants. For this last proposition the language in the Dunn case is an authority, but it must be disregarded on the question about the burden of proof concerning testamentary capacity. In the Dunn case the principal attack was based upon undue influence and the inclusion of testamentary capacity in the opinion must be set down as a slip of the pen. The authorities on the subject of testamentary capacity are collated in *Deckenbach* v. *Deckenbach,* 65 Or. 160 (130 Pac. 729), and *Wade* v. *Northup,* 70 Or. 569 (140 Pac. 451).

The reason underlying the rule as to the burden of proof respecting testamentary capacity and undue influence may be thus stated: If there is no will in existence, the property of a testator is distributed according to the statute of descents. If anyone would interrupt this course of distribution he must show not only a properly executed will but that there was a testator competent to publish such a document. The persons naturally interested in the estate under the statute of descents have not had their day in court where the will has been admitted to probate in common form. Consequently, the burden of making a different disposition of the property lies upon him who propounds the will to show that the testator had testamentary capacity and that the instrument in question was executed in due form of law. On principle, the question is different where the effort is to overturn the will on the allegation that it is the product of undue influence. This is a species of fraud by the exercise of which the nominal testator is supposed to have been deluded into making a disposition of property which is not the product of his own mind.

2. It is hornbook law that he who alleges fraud must prove it, so that in good reason, as stated in *Simpson*

v. *Durbin,* 68 Or. 518 (136 Pac. 347), the burden of establishing undue influence lies upon those alleging it.

As to the delusion mentioned in the contestants' petition, the circumstances appearing in evidence are substantially these: For about nine years prior to his death Clark Sturtevant, son of the testator, had managed the business of his father at Pilot Rock, having practically entire charge thereof. Under the son's management the business had not prospered as it had under the direction of the father. Prior to her death the wife of the testator told him that Clark had loaned some money to a cattle concern in the neighborhood. At his death the books showed an indebtedness of the son for goods he had used in his living. Still further, when an effort was made after Clark's death to collect the accounts standing on the books, many debtors came forward and claimed that they had made payments to Clark in his lifetime, with which they had not been credited. The evidence shows that while the testator tolerated the wife of his son Clark, he did not like her. His aversion for her was increased by the fact that after the death of her husband she claimed from the father wages which she asserted were due to her husband from the father for the management of the business, and caused the administrator of the son's estate to commence an action at law against the father to recover $7,000 as wages of her deceased husband. The father retorted with a cross-bill in equity, demanding an accounting of the son's stewardship during the period the latter managed the business at Pilot Rock. About this time, also, at the instance of their mother, the minor children of Clark Sturtevant instituted a suit against A. J. Sturtevant and his guardian to compel the conveyance to them of certain real property at Pilot Rock

standing in the ward's name, which they claimed should have been conveyed to their father. Meanwhile the guardian had been appointed for the testator and he settled the suits by payment to the estate of Clark Sturtevant of the sum of $1,000 and the execution of a deed to the minor children of Clark Sturtevant for the lots at Pilot Rock. One of the terms of the stipulation winding up the three suits was that the right of the two children to inherit property from their grandfather or his deceased wife should not be settled, compromised or affected by the adjustment of the litigation.

There is some evidence that the testator made some inquiry as to whether any money was buried by his deceased son and that at various times he claimed that the son had taken his money during the management of the business; but with respect to the minor children, his statement to the attorney who drew the will in question was to the effect that he thought by receiving the money and the real property in the settlement of the litigation they had received enough from his estate and hence he chose to allow them only the nominal sum of $2.50 each. Having before him the facts that his previously prospering business declined under the management of his son, that the latter's own books showed him indebted to his father, that the various debtors came forward with well-substantiated claims that they had paid money to the deceased son for which they had not received credit, and the statement made to him by his wife that the son had loaned money to the cattle concern, the testator had data upon which to found his assertion that the son had embezzled his money.

3. He may have rendered too harsh a judgment upon the deceased son, but it was not because of a delusion,

for there was some evidence to sustain it. Delusions are defined in *Potter* v. *Jones,* 20 Or. 239 (25 Pac. 769, 12 L. R. A. 161), to be:

"Conceptions that originate spontaneously in the mind without evidence of any kind to support them, and can be accounted for on no reasonable hypothesis. The mind that is so disordered imagines something to exist or imputes the existence of an offense which no rational person would believe to exist or to have been committed, without some kind of evidence to support it."

On this branch of the case it is not for us to say whether in fact the son embezzled the money, but we must say from the record that there is evidence suffi-. cient on that subject, which, presented to the mind of his father, would be a basis upon which the latter could render a judgment—without having a delusion imputed to him—although his decision might in our estimation be a harsh one.

4. On the record before us we are compelled to say under the authorities that there was no delusion proved as alleged in the contestants' petition: *Stevens* v. *Myers,* 62 Or. 372 (121 Pac. 434, 126 Pac. 29), and authorities there cited.

Respecting the appointment of the guardian for the decedent, it is said in *Ames' Will,* 40 Or. 495 (67 Pac. 737):

"The appointment of a guardian for a person alleged to be *non compos mentis,* by a court having jurisdiction, must necessarily create a presumption of the mental infirmity of the ward; but such decree does not conclusively show that the testamentary capacity of the person under guardianship is entirely destroyed, and the presumption thus created may be overcome by evidence proving that such person at the time he executed a will was in fact of sound and disposing mind and memory."

In later authorities, such as *In re Sneddon*, 76 Or. 470 (149 Pac. 527), and *In re Northcutt*, 81 Or. 646 (148 Pac. 1133, 160 Pac. 801), a distinction is made between an insane person and one incapable of conducting his own affairs.

5. In any event, a person under guardianship does not on that account lose his right to make testamentary disposition of his estate, if he retains sufficient mental capacity to execute a will.

On the main question of the testamentary capacity of the testator, as stated in the Ames case:

"The rule is settled in this state that if a testator at the time he executes his will understands the business in which he is engaged and has a knowledge of his property and how he wishes to dispose of it among those entitled to his bounty, he possesses sufficient testamentary capacity, notwithstanding his old age, sickness, debility of body or extreme distress" (Citing authorities.)

This is the established standard in Oregon and has been followed without variance from *Hubbard* v. *Hubbard*, 7 Or. 42, until the present time. For instance, in *Rothrock* v. *Rothrock*, 22 Or. 551 (30 Pac. 453), the testator was so paralyzed as to be speechless and made his wishes known respecting the disposition of his property by nodding his head in answer to questions propounded by the scrivener. In *Clark* v. *Ellis*, 9 Or. 128, the characteristics of the testator were very largely like those detailed in the evidence about the author of the will here in question. There the testator was suffering from incurable disease, talked foolishly and was possessed of the notion that his partner had fixed a trap in his bath to suffocate him and that he was trying to get rid of him; all without foundation. He frequently wept and at times gave strong indications of insanity. Yet the court sustained his will on

the testimony of the subscribing witnesses who deposed that at the time he made the will he was rational and knew what he was about.

Many witnesses for the contestants here narrated certain eccentricities of conduct of the testator and of his habits of uncleanliness resulting from his inability to control the discharges of the intestines and bladder, and his apparent unconsciousness of the same; and many of his letters were introduced, written during the period from prior to his guardian's appointment up to about the time the will in question was executed. These writings, especially during the year 1911, show incoherencies and repetitions of words and phrases. Reading the entire correspondence, however, shows that towards the latter part of the period his writing improved in coherency. It is shown also that he made many wills, writing some of them himself. Indeed, there are in evidence four of his wills, regularly executed so far as form is concerned, dated respectively July 19, 1907, January 19, 1911, February 7, 1911, and December 29, 1911. All but the first of this quartette of wills were made in the same year and while the witnesses for the contestants all give their opinion that he was insane and incapable of making a will, the contestants, however, rely upon the will of December 29, 1911, and propounded it for probate soon after the old man's death, and it was probated in common form. Under these circumstances the contest is really between the two wills, the one of December 29, 1911, and that of November 5, 1913.

Respecting the sanity of an individual, Section 727, L. O. L., reads thus:

"In conformity with the preceding provisions, evidence may be given on the trial of the following facts:— * *

"10. The opinion of a subscribing witness to a writing, the validity of which is in dispute, respecting the mental sanity of the signer, and the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given. * * "

Many witnesses were called for the contestants who gave instances of the testator's eccentric conduct, such as not recognizing old acquaintances, his failure to find his boarding place in the town of Pendleton and of inquiring how to get to various law offices with which he ought to have been familiar from previous acquaintance in the town, and with practical uniformity those testifying were asked their opinion as to whether he was capable of making a will. That is the ultimate question to be determined in the case, and propounding such interrogatories is on a par with calling upon witnesses in a criminal case to give their opinion as to the guilt of the defendant. It is for the court to determine whether the testator was capable of making a will. The decisions are not entirely harmonious on this subject, but in the note to *Atwood* v. *Atwood*, 37. L. R. A. (N. S.) 591, the authorities are assembled showing that the weight of precedent is to the effect that in the contest of a will opinion evidence as to the capacity of the testator to make a will is incompetent. The principal case is reported also in 84 Conn. 169 (79 Atl. 59). See, also, *Brown* v. *Mitchell*, 88 Tex. 350 (31 S. W. 621, 36 L. R. A. 64, and note).

6. Under the Code mentioned, if the witnesses were intimate acquaintances of the testator they had a right to express their opinion as to his sanity and give their reasons for it, but when they undertook to decide against his capacity to make a will they invaded the province of the court.

As frequently is the case in such litigation, the trial was permitted to extend over a very wide range of in-

vestigation, much of it entirely irrelevant, and we regret to state that the proceedings were clouded with a considerable degree of rancor which makes the investigation of the issues all the more difficult. The two questions to be determined are simply whether the testator had testamentary capacity at the time he executed the will in question, and, granting that it was executed, whether it was the product of undue influence exerted upon him by Mark Sturtevant or his wife, or persons operating in their interest. Incidentally, the alleged delusion about the defalcation of his deceased son is to be considered in connection with his testamentary capacity.

7. The honesty of the son is not directly in issue. Hence, evidence offered by the contestants to the effect that Clark Sturtevant bore a good reputation for honesty and integrity was irrelevant and should have been excluded under the authority of *Ladd* v. *Sears,* 9 Or. 244. In that case the plaintiffs accused the defendant of overdrawing his account in their bank to the extent of $500, and it was alleged that he did this by means of imposition and fraud. The court there said:

"The offer by defendant to introduce evidence of his general good character for honesty and integrity was properly overruled. While the complaint charged him with imposition and fraud in obtaining the sum of money in controversy, such claims were not essential to plaintiffs' cause of action and need not have been either alleged or proved. The gist of the action was money had and received, and the right of plaintiffs to recover, and the amount of recovery in no wise depended upon the proof of any fraud or evil motive on the part of the defendant, in any part of the transaction."

In respect to the delusion mentioned, the legitimate scope of the inquiry is to ascertain whether there was any evidence whatever upon which the testator

could found his judgment, however just or unjust, in regard to the fraud of his son. The court was not called upon to adjudicate in the present litigation any of the rights of the father or of the son in their relations to each other.

In support of the will we have the testimony of the attorney who drew it, to the effect that in obedience to a message sent to him by the testator from Pilot Rock, he went there from Pendleton and together he and the testator walked out into the orchard and the old man told him how he wanted the will drawn. Not being prepared to write it there, it was arranged that the attorney should return to Pendleton and that Sturtevant should call there within a few days, when the writing should be done and the instrument executed. In conformity with this agreement, the old man appeared in the attorney's office alone on November 4, 1913. At that time he had a written memorandum in his own handwriting in the shape of notes on the subject of his will, and, as the attorney states, Sturtevant then and there dictated to him the terms of the will, paragraph by paragraph. As soon as each paragraph was written it was read over to the testator, who approved it, and then they took up the next paragraph, which the old man also dictated, and so on through the will. Speaking of his grandchildren, the contestants, he gave as a reason for allowing them only a nominal sum apiece that they never came near him and that they had procured judgment against him for $1,000 and the real property at Pilot Rock already mentioned, and he thought that was enough for them. In support of the clause making Mark Sturtevant the residuary legatee he said that Mark had been treating him better lately and he thought he ought to have the property. There was no witness conveniently at hand

at the time, and so the actual signing of the document was postponed until the next day, when the testator again appeared at the office of the attorney, who called in a physician whose office was in the same building. It was known to all parties that the deceased was then under guardianship, so as a precautionary measure the physician, as he describes in his testimony, thoroughly examined Sturtevant as to his sanity, occupying almost an hour in the process, and the will was again read over to him, paragraph by paragraph, and he expressed his approval of the same. The will was then executed in due form, the attorney and the physician subscribing their names as witnesses. Both of them say that he was of sound mind at the time. This they were authorized to do under the section of the statute above noted, because they were subscribing witnesses to the document. The substance of their testimony is that the old man knew what he was about. This was supported by the fact that he was in the habit of making wills, and in the explanation of that conduct one witness says that when taxed with changing his mind so often he said in substance, "Things change, and I have a right to change my will." He certainly knew what he was doing. Without prompting, he spoke of the objects of his bounty. He made provision for the support of the two daughters of Mark Sturtevant and also for the benefit of Mark's wife. He remembered and provided nominally for the remaining grandchildren, who would have a claim upon his estate if he died intestate, and gave at least a plausible reason for his small bequest to them. The attorney says that he furnished the description for the real property mentioned in the will, showing that he had knowledge of his estate. No question is made but that he owned that property. Hence, we have all the elements established which

enter into the standard rule laid down in *Ames' Will*, 40 Or. 495 (67 Pac. 737).

8. The will must speak from and as of the time it was executed. When we come to weigh the testimony, on the one hand, we have the actual, positive, unqualified testimony of the subscribing witnesses, delineating all the elements of testamentary capacity according to the standard established by the Oregon decisions. On the other, we have the opinions of many other witnesses, both lay and professional, based upon eccentricities of action, writing and speech. In *Pickett's Will*, 49 Or. 127, 153 (89 Pac. 377, 386), the testator was sixty-eight years old, blind, and in gradually failing health from a progressive hardening of the arteries, which resulted in his physical prostration, owing to inability to control any of his muscles, and a gradual failure of mind followed by death from want of arterial blood. In these respects the case of Pickett is closely paralleled by that of Sturtevant. There, as here, there were opinions *pro* and *con* respecting his mental capacity, and the matter is thus epitomized:

"At the utmost, this is but opinion evidence, which may or may not be correct, but it cannot be permitted to overcome the unqualified statements of an unimpeached witness of the existence of the very fact that the opinion says is impossible."

The testator in *Clark* v. *Ellis,* 9 Or. 128, was very similar to the testator in the instant case and in summing up, Mr. Chief Justice LORD used this appropriate language:

"The point of time, then, to be considered at which the capacity of the testator is to be tested, is the time when the will was executed. This is the important epoch, and Judge WASHINGTON says: 'The evidence of the attesting witnesses, and next to them of those who

were present at the execution, all other things being equal, are most to be relied upon.'   In the case before us, none other than the attesting witnesses were present at the execution, and they have testified to the soundness of his mind at that time.   The evidence of the attorney who drew the will according to his instructions, and the positive and uncontradicted testimony of the subscribing witnesses to the will, of the soundness of the testator's mind at the time the will was executed, establish beyond doubt that the testator was rational, and did know and understand what he was doing at the time the will was executed."

It would seem that this language of the learned Chief Justice LORD is decisive of the present contention.

In *Wendl* v. *Fuerst,* 68 Or. 283, 293 (136 Pac. 1), the court, speaking by Mr. Justice RAMSEY, had occasion to contrast opinion evidence with that of witnesses who spoke directly to the question at issue, and the following excerpt from 5 Encyclopedia of Evidence, page 463, is quoted with approval:

"Generally the testimony of an expert will not be allowed to overthrow positive and direct evidence of credible witnesses, who testify from their personal knowledge."

As between the direct testimony of the subscribing witnesses and the statements of the other deponents to the effect that in their opinion the deceased was not competent to make a will, we have the opinion that the testator could not do such a thing, and on the other hand we have the positive statement that the testator did actually do the thing the others thought he could not do, and that, too, in a manner meeting all the elements and subserving all the conditions laid down as components of testamentary capacity.   The case of the proponents, however, is well supported by testimony of old friends and acquaintances of the deceased, both

lay and professional, to the effect that while the old man was weakened by age, he retained a knowledge of his property and business and of his children and grandchildren, and knew what he was about in respect to his estate.

Dr. C. J. Smith, who resided for many years at Pendleton, was well acquainted with the testator during all that period and subscribed as a witness some of the wills mentioned, describes the old man thus:

"He was considered quite a strong man mentally and he had very strong convictions of his own and willing to express himself frequently."

Speaking further, of the effect of a stroke of paralysis, he said:

"I don't think it impaired his mental faculties so much, except, however, he was partially paralyzed at that time, and naturally left one side weak and he always used a cane, but he continued to transact his business for a number of years. Although physically weakened, nobody questioned his mind under the circumstances. * * He was rather cutting with his tongue, and witty. He could say very cutting things at times."

The essence of Dr. Smith's testimony may be expressed in his statement as follows:

"I have never believed Mr. Sturtevant to be insane. As I said before, I have always known him since I first became acquainted with him in '92 to be an eccentric character, and as he became older, more so."

Other physicians, testifying for the contestants, gave their opinion that he was incapable of making a will, but the effect of their testimony is considerably weakened by the fact that after the guardian was appointed, Sturtevant was brought before the County Court of Umatilla County on the charge that he was insane, with a view to committing him to the insane

hospital, and some of these same physicians, having examined him at the hearing, pronounced him sane, so that he was discharged. One of them, speaking of this proceeding, said in substance that he stood a fine mental examination. But he qualifies his course there by saying that he then entertained some doubt as to Sturtevant's sanity, but pronounced him legally sane on the ground that the state hospital was then taxed to its capacity for patients.

It is charged in substance by the contestants that the old man was unable to tell whether he was making a will or instituting a proceeding to remove his guardian. The undisputed fact is that the guardian had custody of the will of December 29, 1911, and refused to surrender it to the testator. The latter was displeased with his guardian because he suffered judgment to be entered against him for the $1,000 mentioned and for the conveyance of the property in the settlement of the litigation with his deceased son's children and their mother. It is charged also that he expressed his dissatisfaction with his guardian's keeping him at Pendleton at an expense of $50 per month, when he could have kept him at Pilot Rock, amid home surroundings, for less money, and he complained of various expenses to which his estate was subjected under the control of the guardian. It is not a question of the honesty or integrity of his custodian; that is not here at issue and it may be said in passing that at best, speaking most strongly against him, all that can be said from the record is that men would differ as to the wisdom of his judgment in his management of his ward's affairs. There is nothing to impeach his honor or probity; but looking at it from the old man's viewpoint, affected as he was by hostility towards the widow of his son on account of her

having caused the action against him for $7,000 and demanding a deed for the real property, we cannot say that he did not have reason to be displeased with the administration of his guardian. The testimony shows that, having been unable to get the guardian to give up the will of December 29, 1911, he sought the advice of the attorney who drew the will, about how he could defeat that testament which made his guardian the trustee of his estate, and the attorney explained to him, as the evidence shows, that the will could be disposed of by making a later one with different provisions respecting the custody of his estate. There is no testimony tending to show that he thought he was engaged in a proceeding to remove the guardian. On the contrary, it is manifest that he knew he was making a will, and nothing else.

9. We conclude upon this branch of the case, from a careful examination and study of the whole testimony, that while by reason of old age and infirmity, A. J. Sturtevant was not so bright mentally as he had been in his prime, yet he retained sufficient mentality to enable him to know the nature of the transaction in which he was engaged while making his will; that he was then arranging a final disposition of his property to take effect after his death; that he had a comprehension of his property and knew and remembered all those who would have any claim upon his estate under the statute of descents, in case he died intestate.

It remains to consider the charge that the will was the product of undue influence. The only direct testimony in favor of the contestants on this point is that given by Faye Sturtevant, the daughter of Mark Sturtevant. She was evidently simple-minded and appeared to be incensed at her father because he had taken steps to prevent her marriage. Some of her testimony is quoted:

"Q. What did Mark say to him about what he should do with his property, if anything?

"A. He said he should leave it to him; he thought he had deserved it, he had worked on the place and he thought he ought to have it, he had taken care of him and he thought the others were trying to get it away from him with robbing him. * *

"Q. What did Alma tell your grandfather, if anything, about what he should do with his property?

"A. She said something about the same, she said the rest of them were working for it and trying to get it away from him."

On the contrary, Mark Sturtevant flatly denies that he undertook to influence his father in any manner in the disposition of his property. On cross-examination, when pressed by the attorneys for the contestants, he testified thus:

"Q. After you got back there you and your wife were pretty careful not to have any trouble with the old gentleman, weren't you?

"A. No, sir. I was not any more careful than before and I don't know as she was.

"Q. You were not trying to be good to the old man so he would think you were pretty good children and leave his estate to you, or anything of the kind?

"A. No, sir. I know if I asked him to make me a will he would turn and act the other way. I knew him better than you did. If you wanted to bulldoze him into doing anything you would get nothing, you had to let him have his own way.

"Q. That is what you and your wife did while up there the last time, wasn't it, and you let him go his own way?

"A. No, sir. He done as he pleased. I never asked him to make a will."

Remembering that under the authority of *Simpson* v. *Durbin*, 68 Or. 518 (136 Pac. 347), the burden is upon the contestants to prove the undue influence, we

here set down an excerpt from the opinion by Judge Sanborn in *Sawyer* v. *White*, 122 Fed. 223 (58 C. C. A. 587):

"There is no doubt that he was influenced to do so by his affection for and confidence in his son, and by his gratitude to him for his years of devotion and service. But hatred or indifference is not indispensable to the validity of a gift, nor is gratitude or affection for the grantee fatal to it. * * The natural influence of the affection of a parent for a child is neither fraudulent nor illegal. * * Nor is the fact that the grantee or devisee occupies a fiduciary relation to his grantor or testator necessarily fatal to the gift. It is the use of that relation to secure a deed or devise against the free will or desire of the grantor or donor, and not the mere existence of the relation, that vitiates a grant. It is true that when an unnatural or unreasonable gift or devise is made—such as one by a ward to his guardian, or by a helpless invalid to his nurse, or by a client to his trusted attorney—the presumption at once arises that the fiduciary relation was used to overcome the will of the grantor, and that the deed or devise is voidable. But when the natural gift of a parent to a loved and trusted child is in question, this presumption is met and overcome by the still stronger presumption that such a gift is the natural and reasonable act of the parent, and that the free will of the donor inspired the grant, uninfluenced by the trust relation."

The doctrine is set forth in similar terms in *In re Will of Hiram* v. *Allred*, 170 N. C. 153, 158 (86 S. E. 1047, 1049, Ann. Cas. 1916D, 788, L. R. A. 1916C, 946, 949), quoting with approval from the opinion of Mr. Justice McClellan in *Bancroft* v. *Otis*, 91 Ala. 279 (8 South. 286, 24 Am. St. Rep. 908):

"With respect to testamentary dispositions, the primary presumption upon which the whole superstructure of the doctrine of presumed undue influence in contracts and gifts *inter vivos* rests is entirely lacking.

They take effect upon the death of the donor. They involve no deprivation of use and enjoyment. There can be, with respect to them, no assumption that the donor would not voluntarily part with his property, since, in the nature of things, it must then pass from him to others selected by himself according to the dictates of his affections, or appointed by the law of descents and distributions, and in either case without consideration moving to him. It is not out of the usual course of things, but in accordance with the exigencies of mortality, that the property should cease to be his, and should become that of another. And the very considerations which lead to suspicion, which must be removed in transactions *inter vivos*—friendship, trust and confidence, affection, personal obligation—may, and generally do, justly and properly, give direction to testamentary dispositions.''

The situation confronting the old man in November, 1913, may be thus described: He was not without cause to be grieved at the management of his business by his deceased son. The children of that son ignored him and paid him no attention. Actuated by their mother, whom he did not like, they sued him for $7,000 and for some real property. His guardian offended him by settling the litigation in a manner, according to the old man's estimate, disadvantageous to him. Naturally an estrangement arose between him and Clark Sturtevant's children. He grouped them with their mother, who controlled them, and from his viewpoint he had cause to ignore them in the final disposition of his property. He gave a plausible reason for his action. Displeased with his guardian, he sought to deprive him of the *post-mortem* management of his property as trustee thereof; all of which he could accomplish by making a subsequent will. His only surviving child was Mark Sturtevant and it was normally to be expected under the circumstances that he should

give this son the preference in the distribution of his worldly effects. He gave as a reason therefor that Mark had been better to him lately and, as pointed out in the precedents last above quoted, the influence of such conduct, nay, even a request that the property be left to him, would not amount to undue influence. At least, on the whole case the scale predonderates against the contestants on that issue. The property was that of the testator. When the will was drawn none of the contestants or proponents had any interest whatever therein. It was his to do with as he chose. The right to make testamentary disposition of it is a rule of property not to be disturbed except for clear and cogent reasons. We are not concerned with what we, from our standpoint, might consider to be the justice of the distribution. As said by Mr. Chief Justice McBride in *Beakey* v. *Knutson,* 90 Or. 574 (177 Pac. 955):

"It may be said the will is unjust, * * but, perhaps unfortunately, the law does not avoid a will because it fails to square itself with what persons other than the testator deem to be justice."

And it was set down in *Ames' Will,* 40 Or. 495 (67 Pac. 737):

"When a will has been properly executed, it is the duty of the courts to uphold it, if the testator possessed a sound and disposing mind and memory, and was free from restraint and not acting under undue influence, notwithstanding sympathy for persons legally entitled to the testator's bounty and a sense of innate justice might suggest a different testamentary disposition."

Further, as said in *Van Alst* v. *Hunter,* 5 Johns. Ch. 148, 160:

"It is one of the painful consequences of extreme old age that it ceased to excite interest, and is apt to be left solitary and neglected. The control which the

law still gives to a man over the disposal of his property, is one of the most efficient means which he has in protracted life to command the attentions due to his infirmities. The will of such an aged man ought to be regarded with great tenderness, when it appears not to have been procured by fraudulent arts, but contains those very dispositions, which the circumstances of his situation, and the course of the natural affections, dictated."

10. In brief, on the issue of testamentary capacity, we may say that in our estimate the opinion evidence is perchance at a balance and the case is controlled by the direct testimony of the subscribing witnesses who were present and gave particular attention to the mental capacity of the testator, and who detail his expressions about the manner in which he wished to dispose of his property and to whom he intended to leave it. The issue of undue influence is not sustained.

Under the circumstances, the opportunity for Mark Sturtevant or his wife to exercise undue influence is all that is shown on the subject, by a preponderance of the testimony. Considering his antipathy towards the mother of Clark Sturtevant's children and to his guardian, which was not without foundation, and the estrangement which arose on account thereof, and the kind treatment which he says was given him by Mark Sturtevant, the disposition was a normal one which he had a right to make and is not, in our judgment, the product of any undue influence whatever.

The conclusion is that the decrees of the Circuit Court and County Court setting aside the will in question must be reversed and the cause remanded with directions to admit the will to probate as the last will and testament of A. J. Sturtevant, deceased.

Reversed and Remanded. Rehearing Denied.

Harris, J., not sitting.

Denied May 13, 1919.

## ON PETITION FOR REHEARING.

### (180 Pac. 595.)

On petition for rehearing.                    DENIED.

In Banc.

*Mr. Stephen A. Lowell, Messrs. Raley & Raley, Mr. W. M. Peterson, Mr. C. M. White* and *Mr. Frederick Steiwer,* for the petition.

*Mr. James A. Fee, contra.*

McBRIDE, C. J.—The brief upon the petition for rehearing practically travels over the same ground occupied by the original briefs, and most of the contentions therein seem to us to be sufficiently answered in the original opinion.

11. The test of testamentary capacity is well stated in the original opinion, but the following excerpts may serve further to elucidate the subject, and to distinguish between testamentary capacity and the capacity to contract generally.

"The result of the best considered cases on the subject seems to put the *quantum* of understanding, requisite to the valid execution of a will, upon the basis of knowing and comprehending the transaction or, in popular phrase, that the testator should, at the time of executing the will, know and understand what he was about. * * It is sufficient if the testator knew what he was doing and to whom he was giving his property * * and it is conceded in most of the cases that a man may be capable of making a will, and yet incapable of making a contract or managing his estate": *Brinkman* v. *Rueggesick,* 71 Mo. 553, citing Ray Med. Jur. 313; 2 Redfield on Wills, Chap. 4, § 10; *Thompson* v. *Kyner,* 65 Pa. St. 368; *Stubbs* v. *Houston,* 33 Ala. 555. See, also, *Stackhouse* v. *Horton,*

15 N. J. Eq. 202; *Crossan* v. *Crossan,* 169 Mo. 631 (70 S. W. 136).

12. The evidence shows that at the time the will was executed, the decedent knew he was making a will; knew the persons to whom he wished to devise his estate; knew of what his estate consisted; knew the persons whom he wished to exclude from participation in his bounty, and gave an apparently intelligent reason for so excluding them, and unless we reject the testimony of the subscribing witnesses absolutely, which we are not prepared to do, his condition measured up to every test laid down by the authorities for judging the capacity of a person to make a will. It is not sufficient to show that a testator had delusions upon *some* subject, if these delusions did not affect his mind in making his bequests: *McClary* v. *Stull,* 44 Neb. 175 (62 N. W. 501).

13, 14. It is claimed that decedent was under an insane delusion that his deceased son Clark had embezzled his money, and that his practical disinheritance of Clark's children was the result of this delusion. A delusion is a fixed belief in a proposition which has no foundation in evidence, and which is so extravagant that a reasonable man would not adhere to it. It is a fixed and extravagant belief that a fact exists where there is no evidence to furnish a basis to such belief. The rule in regard to this matter is very similar to the rule adopted in this state in regard to the verdict of a jury. If there is any evidence to sustain the verdict it must stand. So here, if there is any evidence to support the belief, it is not a delusion: *In re Scott's Estate,* 128 Cal. 57 (60 Pac. 527).

The decedent's belief in his deceased son's dishonesty had some evidence to sustain it: First, the son took charge of decedent's store, which was a

profitable business, and left it an unprofitable business; second, many bills, which the books indicated were unpaid, were found 'upon the statements of reputable persons to have been paid, and these sums were not accounted for.

Now these circumstances may be accounted for upon the theory of the son's incapacity for business or carelessness in keeping his accounts, but, on the other hand, there are many business men who might adopt the same theory adopted by decedent, and attribute the losses to dishonesty and peculation; and this might be especially true with an old man who had conducted the business profitably himself, and who would not be likely to see any reason why his son could not have done the same. He would naturally ask:

"Why is it that my once profitable business shows a loss under my son's management? What has become of the money which these debtors paid him, and for which there is no account?"

So there was some evidence upon which deceased could found a perfectly natural belief that the son had not dealt fairly with him. That belief was probably a mistaken one, but it was not an insane delusion.

15. His failure to make provision for Clark's children was brought about, to a great extent probably, by the act of Clark's widow in bringing an action against him for wages for his son, which she claimed were earned by him while in charge of decedent's store, and by a suit to compel the conveyance to his grandsons of two lots alleged to have been the property of Clark in his lifetime, both of which suits were settled by the guardian unfavorably to decedent and against his protests. The guardian probably acted for the best, but in view of the opinion decedent entertained in regard to Clark's transactions while in charge of the store, the settlement must have been a bitter pill and

left a feeling of resentment which showed itself in the will, and in his statement to Coutts and Ringo, that Clark's children had received enough. In this, he did not display that spirit of magnanimity and forgiveness which he might have exhibited, but the estate was his, earned by his industry and ability, and he had a perfect legal right to dispose of it as he chose.

16. Upon the question of undue influence by Mark and his wife, the contestant had the burden of proof, and we still take the view expressed in the original opinion, that the proof offered by them does not establish the charge that such undue influence was exerted. Kind treatment and even reasonable solicitation do not constitute undue influence, and this is about as far as contestant's testimony goes in this case.

17. We believe decedent, while suffering some mental impairment as the result of old age and disease, yet retained sufficient independent mentality to know what he wished to do with his property, and that the will expressed his desire in that respect.

The petition for rehearing is denied.

REVERSED AND REMANDED.   REHEARING DENIED.

