Argued May 3, affirmed May 11, 1960

In the Matter of the Guardianship of
P. H. SCHMIDT, Incompetent
FAHRENWALD *v.* WACHTER
352 P. 2d 152

*George H. Corey* argued the cause for appellant. On the briefs were Corey & Byler, Pendleton.

*Harold A. Fabre* argued the cause for respondent. On the brief were Fabre, Collins & Kottkamp, Pendleton.

Before MCALLISTER, Chief Justice, and WARNER, SLOAN, O'CONNELL, GOODWIN and MILLARD, Justices.

MILLARD, J. (Pro Tempore)

This is an appeal from an order of the county court of Umatilla county appointing Marguerite M. Fahrenwald guardian of the person and estate of her uncle, P. H. Schmidt, then 71 years of age and alleged to

be an incompetent person, upon the petition of said guardian.

In this petition it is alleged that P. H. Schmidt "is ill and enfeebled in mind and body; that said P. H. Schmidt, by reason of his old age, disease and his enfeebled and weakened mental and physical condition, is unable and incapable of managing his property and by reason thereof, said P. H. Schmidt is an incompetent person, and by reason thereof he is liable to be deceived or imposed upon by artful and designing persons."

The subject of this proceeding is a man 71 years of age who is a bachelor and who has resided near Ukiah in Umatilla county on his ranch where he has lived most of his life. He has three nieces who are daughters of a deceased sister and who are living in the same county, and a sister Rebecca Bengston, 88 years of age, of Brooklyn, New York. He has about an eighth-grade education. By inheritance and through his own efforts he has acquired considerable real and personal property. The real property consists of about 1,100 acres of tillable and 2,000 acres of grazing land. He also has about 250 head of cattle and considerable money contained in three bank accounts. For many years Schmidt has been renting his lands to Lawrence Hemphill, a neighbor and local rancher, and receives as rental one-third of the grain crops and a percentage of the hay crops. Hemphill also takes care of the cattle, the revenue therefrom being equally divided. It also appears that the subject has been in failing health for some years and had suffered a slight stroke in 1958. In January, 1959, he suffered a cerebral thrombosis or stroke which involved the left side of his body and resulted in a coma, necessitating hospitalization for a time. He has recovered somewhat and is now

in a nursing home and able to talk and visit with his old friends, can move his right and left legs to some extent and can sit up in a wheel chair, but for the most part is what is termed a bed patient, and his condition is more or less static. He has difficulty in hearing, and it is evident he has a better memory for the past than for recent events. While no one regarded him as insane, as that term is commonly understood, there was conflicting evidence as to his mental competency to transact business. His regular attending physician, Dr. Easton, thought him sane but also gave as an opinion that "his mental capacity is diminished below normal" and that "his competency so far as knowing what he presently wants or doesn't want is satisfactory; I think his competency as to whether it is the best thing for him is questionable" and that his reasoning ability was impaired in comparison to normalcy. While a contrary opinion was given by others, Dr. Easton thought he was incompetent under the statutory definition. A great majority of the witnesses thought that he would require physical assistance in looking after his business. It should also be noted that in February or March, 1959, Schmidt gave Hemphill authority to write checks on one of Schmidt's bank accounts. Pursuant to this, Hemphill wrote checks for his own purposes to the extent of about $6,947, and Schmidt wrote additional checks to Hemphill, all now regarded as loans and the sum total of which is about $8,799, and not evidenced by any notes or other security. At the present time Hemphill is indebted to Schmidt in about $36,000, including unpaid interest, and only $16,000 and unpaid interest thereon is secured by mortgage. We will hereafter refer to additional facts as found by the trial judge.

Appellant's main contentions are to the effect that

under the statutory law of this state before a guardian may be appointed, mental incompetence must be proved and that the evidence in this case is insufficient. Appellant further contends that to adopt any other statutory construction than the one urged would result in unconstitutionality as being violative of the U. S. Constitution, Fourteenth Amendment, and of the Oregon Constitution, Art 1, §§ 10 and 20.

■ Whatever may be the rule in other jurisdictions, we do not deem our statutes to be limited to a consideration of mental incompetence alone. ORS 126.105 provides for the appointment of a guardian for incompetent persons as well as for mentally diseased persons "who are incapable of conducting their own affairs." Incompetency is defined by statute in this state.

> " 'Incompetent' includes every person who is, by reason of old age, disease, weakness of mind or from any other cause, unable unassisted to properly manage and take care of himself or his property, and by reason thereof would be likely to be deceived or imposed upon by artful or designing persons." ORS 126.005 (2).

In construing the word "incapable" this court has adopted the California statutory definition to this effect: "* * * [It is] construed to mean any person who, though not insane, is, by reason of old age, disease, weakness of mind, or from any other cause, unable, unassisted, to properly manage and take care of * * * his property, and by reason thereof would be likely to be deceived or imposed upon by artful or designing persons." *In re Northcutt,* 81 Or 646, 652, 148 P 1133, 160 P 801.

■ It thus appears that the word "incapable," as

used in our statute as it relates to incompetency, is synonomous with "incompetent," also defined by our statute. California, however, did not so hold. While the section of the California statute relating to incompetency is similar to ours, it was held that since such section was added to existing sections which required the petition for appointment to allege that the person was insane or from some cause mentally incompetent to manage his property, the definition of incompetency "must be understood to mean a mental, rather than a physical inability." *In re Coburn,* 165 Cal 202, 131 P 352, 355, 356.

In *Schafer v. Haller,* 108 Ohio St 322, 140 NE 517, 30 ALR 1378; see also 30 ALR 1381 (Annotation), cited by appellant, it was held that a statutory provision authorizing the appointment of a guardian of a person mentally competent but physically incompetent was an unauthorized abridgment of his right to acquire, possess and protect property and was, therefore, unconstitutional. Assuming the case was correctly decided, it does not follow that the Oregon statutes are, therefore, unconstitutional. In Oregon not only must physical disability or mental incompetence or other cause be shown to authorize guardianship, but it must also appear that he is incapable of conducting his own affairs, as that term has been previously construed, and further that he is unable unassisted to properly manage and take care of himself or his property and by reason thereof would be deceived or imposed upon by artful or designing persons. In *Kutzner v. Meyers* (1915), 182 Ind 669, 108 NE 115, Ann Cas 1917A 872, it was held that a statute authorizing guardianship when "the inhabitant of such county is incapable of managing his estate or business affairs because of old age" was constitutional as

against practically the same objection as made here. A like objection was raised in *MacDonald v. LaSalle National Bank*, 11 Ill2d 122, 142 NE2d 58, 59, where a statute authorized the appointment of a conservator for an incompetent "who by reason of any mental or physical incapacity is incapable of managing and caring for his estate." It was argued that such statute authorized appointment on the basis of physical disability alone. Such contention was rejected, it being pointed out that not only was mental or physical incapacity required but it was also requisite that the alleged ward be "incapable of managing and caring for his estate." Thus, the Oregon statutes do not proceed on the theory of physical disability alone, but there are additional requirements as above stated. In view of these, it is our opinion that such statutes are constitutional.

██ Apart from the question of constitutionality and as regards the sufficiency of the evidence, we adopt the conclusions of the able trial judge, so well and succinctly stated as follows:

"* * * A fair review of the evidence indicates that although Schmidt in casual conversation gives an appearance of mental capacity, his brain damage, in fact, has interferred with the rational functioning of his mind, which makes it impossible for him to manage his property. This is not due to any lack of education or poor business judgment on his part, as he has in the past accumulated considerable property despite his educational handicaps. However, there has been a decided change in his mental capacity as the result of his stroke so that he actually has no appreciation of the exact amount of his property, prices at which products are being sold, amount of money which he has in the bank or amounts owed to him or when due. He is incapable of understanding and recalling facts

in order to adequately exercise his independent will and act with discretion in the ordinary business affairs of life.

"Many of Schmidt's friends of many years testified as to his ability to carry on a rational conversation and recall events of many years past. However, it is not uncommon that persons in Schmidt's condition can more easily recall matters which took place years ago than recent events. Doctors and nurses also testified as to his apparent sanity. None of these, however, had occasion to discuss with Schmidt his business affairs to determine his understanding of these matters. It is in this area that it is obvious his understanding is found to be wanting. He has only the vaguest appreciation of the current status of his whole estate. He does not know how many cattle he owns, how much land is in wheat or other crops, the price at which cattle and the crops have been sold recently, and he does not know how much money is due him from Hemphill, when it is due, how much is secured—nor even if it is evidenced by a simple note. He does not recall that he has given Hemphill authority to write checks on his bank account nor does he know to what extent the latter has used that authority to pay his own personal obligations.

"Schmidt had had a serious damage to a portion of his brain which has affected his mental capacity. He is highly susceptible to any suggestion and is a person 'likely to be deceived or imposed upon by artful or designing persons.' Hemphill has, in fact, been transacting all of Schmidt's business, but his interest as a tenant and debtor to his landlord are adverse. Hemphill is acting as a guardian without court appointment, supervision or bond; he has extensive control over most of Schmidt's property, yet he has no obligation to account to a person capable of exercising independent judgment.

"The court is of the opinion that this is an appropriate case for the appointment of a guardian for the person and estate of P. H. Schmidt. Mar-

guerite Fahrenwald, being one of Schmidt's closest relatives, is able to act, and having some familiarity with ranch operations, she should be designated as guardian upon posting a bond in the sum of $10,000."

We have taken note of the numerous authorities cited by appellant referring to various matters which he deems should be considered by the court in determining the advisability of appointing a guardian, which we find unnecessary to cite here. The order of the circuit court appealed from is in all respects affirmed. It should be noted, however, that a further order should be entered increasing the amount of the bond so as to adequately protect the ward.