(No. 37078.—)
EDWARD LOSS, Appellee, *vs.* MARY LOSS, Appellant.

*Opinion filed September 28, 1962.*

Burton H. Young, of Chicago, for appellant.

Friedman, Armstrong, Donnelly & Friedman, of Chicago, for appellee.

Mr. Justice Daily delivered the opinion of the court:

Edward Loss, petitioner, initiated this action by filing a petition in the probate court of Cook County alleging, among other things, that respondent, Mary Loss, his mother, is incompetent by reason of physical disability and incapable of managing her estate, and praying for the appointment of a conservator. After a bench trial the court entered an order finding respondent to be an incompetent incapable of managing her estate and appointed the Harris Trust & Savings Bank as conservator of her estate. This appeal is prosecuted by respondent who contends, first, that the provisions of our Probate Act which permit the appointment of a conservator for one who is only physically incompetent violates the due process clauses of both State and Federal constitutions, and second, that the order adjudging her to be an in-

competent incapable of managing her estate is against the manifest weight of the evidence.

Respondent's constitutional attack is directed to section 113(c) of the Probate Act, (Ill. Rev. Stat. 1959, chap. 3, par. 265(c),) authorizing probate and county courts to "adjudge a person incompetent pursuant to this Act and appoint a conservator for him," and to that part of section 112 which defines an incompetent as: "* * * any person who because * * * of physical incapacity * * * is incapable of managing his person or estate * * *." (Ill. Rev. Stat. 1959, chap. 3, par. 264.) In *Schafer* v. *Haller*, 108 Ohio St. 322, 140 N.E. 517, the principal authority relied upon by respondent, it was held that a statutory provision authorizing the appointment of a guardian for a person mentally competent but physically incompetent was an unauthorized abridgement of such person's constitutional right to acquire, possess and protect property, and it is respondent's contention that our statute is subject to the same infirmity. Respondent, however, overlooks the provision in our act which serves to distinguish it from the statute condemned by the Ohio court. As heretofore pointed out in *MacDonald* v. *La Salle National Bank,* 11 Ill.2d 122, where the substantially identical antecedent of the present act was under consideration, the Illinois act does not permit a finding of incompetency or the appointment of a conservator for physical incapacity alone, but expressly provides that, before physical incapacity is sufficient to permit such adjudication and appointment, it must be such as to render the person "incapable of managing his person or estate." In short, whether the incompetency be founded upon physical or mental incapacity, judicial intervention is permitted only to protect those who are themselves unable to protect their persons or property. Stated differently, the statute deprives no one of their rights over their property, for it may come into operation only when a person is incapable of exercising those rights for himself. Statutes of this type, as pointed

out in the *MacDonald* case, (11 Ill.2d at 124-125), have been repeatedly upheld against the constitutional objections here made, and we see no basis for departure from this majority view in the instant case. See also: *In re Schmidt's Guardianship*, 221 Ore. 535, 352 P.2d 152.

Facts relevant to the claim that the order of the probate court is against the manifest weight of the evidence disclose that respondent, now 77 years old, suffered a stroke as the result of a cerebral hemorrhage in September, 1956. After initial hospitalization for six months and confinement in nursing homes for a period of two years she was removed to the home of her daughter, Merle Loss Hansen, in March, 1959, where she is now attended around the clock by a registered nurse, a practical nurse, and her daughter, working in eight-hour shifts. While the latter move was dictated by economy, it is unquestioned that respondent is receiving proper and loving care which has served to prolong her life. It is also undisputed that Merle and her husband, at a cost of $4000 raised by a mortgage, built an extra room on their home in order to accommodate respondent.

Since the date of the stroke respondent has suffered a complete paralysis of the left side, has been unable to speak except for an occasional word and cannot swallow. She is fed through a tube inserted directly into the stomach and tubes are likewise employed to remove body wastes. She can hear, read, watch television, walk "with great assistance," and is able to be out of bed and to sit up for short periods of time. Apart from nodding her head in response to leading questions, her only method of communicating with those around her is by writing. It appears, however, that she must rest after writing a half dozen words and that, as her hand tires, the writing becomes progressively illegible. Petitioner, in describing the ability of his mother to write, testified that her words would "drift into nothing" and that her "mind would wander."

Dr. Lawrence B. Earle, the attending physician, testified

that while respondent becomes emotionally disturbed on some occasions, he did not believe the illness had affected her mental condition, that respondent was happy and seemed to know what was going on, and that he thought her fully capable of exercising her free will. A registered nurse, who has been attending respondent, described her as having good memory and comprehension, and stated that respondent is now fairly well mentally adjusted to her illness. In like manner Dr. Maurice L. Stern, a specialist in psychiatry and neurology, who examined respondent at the behest of petitioner, was of the opinion that she was mentally competent.

At the time of her stroke in September, 1956, respondent's estate consisted of the following: first, the proceeds of the sale of some stock amounting to $3700, which was held in a joint bank account with her son William, who died in 1960, (at some time after the stroke, according to petitioner, the respondent made a gift of this fund to William,) second, an interest as joint tenant with each of her three children, William, Merle and Edward, in three separate funds of either $21,000 or $23,000. At the time of William's death there was $2,000 remaining in the fund held jointly with him, while, at the time of trial, there was, respectively, $200 and $11,000 remaining in the funds jointly owned with Merle and petitioner. There is no question but that all monies used from these funds has been expended for the care and support of respondent. Third, respondent was possessed of a residence in Maywood, valued at $15,000 to $20,000, where William and his family resided. A will executed by respondent before her stroke devised this property to William and, shortly after his death, she conveyed it to William's wife and daughter, then redrafted her will accordingly.

The fourth and principal asset of respondent's estate was the full beneficial interest in a $90,000 trust which respondent had created for herself in 1939 with the Harris Trust & Savings Bank as trustee. Under the trust respond-

ent reserved to herself alone the right to make partial revocations from time to time for the withdrawal of principal. For the first 2½ years after the stroke, while respondent was being cared for in a hospital and nursing homes, the cost of her care totalled some $30,000 a year and was paid by respondent's brother and sister, plus contributions by the children from the joint funds previously described. With the brother and sister unable to give further help and the joint funds (except for petitioner's) nearing depletion, respondent was moved to Merle's house in March, 1959, where the annual cost of her care has been approximately $14,775. The latter figure, in addition to expense for nurses, drugs and laundry, includes $120 a month paid to Merle for services, meals and incidentals. In 1959, $1000 was withdrawn from the trust; the sum of $11,000 in 1960 and $12,000 during the first six months of 1961. All revocations or withdrawals were in amounts ranging from $1000 to $4000 and, at the time of trial, the value of the trust was approximately $65,000. So far as the record shows, all of the money withdrawn was expended for respondent's care, with the exception of $2600 which, in April, 1961, respondent gave to Merle as a gift for the purchase of a station wagon.

All revocations or withdrawals from the trust fund were by written authorizations signed by respondent and presented to the trustee by Merle. During this period, the trustee had no direct contact with respondent, but would inquire of Merle in each instance whether the authorization had been currently signed by respondent and whether the latter fully understood the instrument. In addition, according to an officer of the trust department, he had discussed the partial revocations with petitioner. Merle testified that she prepared the typewritten revocations, that her mother would sign them, and that she would read to her mother both the revocation and correspondence from the bank confirming changes in the trust. Upon receipt of trust funds, Merle places them in a checking account maintained at the

trustee bank and uses them as the need arises. Except for petitioner's objections to the gift of $2600 to purchase a car, the record is devoid of proof that any of such monies have been diverted from the mother's care. It was petitioner's belief that respondent's estate was being unwisely depleted by extravagant gifts and high costs with no accounting, which precipitated this proceeding.

We cannot say from our examination of the record that the evidence does not support or justify the order of incompetency, or that the finding of the trial court was so manifestly or palpably wrong as to warrant our interference on review. There can be no doubt that respondent is physically incapacitated and we think it equally clear and convincing from the record that such incapacity has rendered her "incapable of managing her estate" within the purview of the statute. Although the medical testimony deemed her mentally competent, the very nature of her physical incapacity, the dubious quality of her ability to communicate her will to others, her complete personal isolation from the trustee and the depletion of her estate by gifts at a time when her own needs are paramount, all tend with reason to support the conclusion that she is incapable of protecting her property or managing her affairs to her own best interest.

Accordingly, the order of the probate court of Cook County is affirmed.

*Order affirmed.*