IN THE MATTER OF PETITION FOR APPOINTMENT OF GUARDIAN FOR MARTHA A. C. WURM, AN AGED AND INFIRM PERSON, MARTHA A. WURM *v.* KAY HAESSLY ET AL.

[No. 3-975A191. Filed February 14, 1977. Rehearing denied March 31, 1977. Transfer denied June 29, 1977.]

*John F. Lyons,* of Fort Wayne, for appellant.

*Howard S. Grimm, Sr.,* of Auburn, for appellees.

HOFFMAN, J.—This is an appeal from a judgment appointing respectively Marilyn R. Molargik and the Garrett State Bank as guardians over the person and estate of Martha A. C. Wurm. The issues presented concern whether the trial court properly interpreted the meaning of the term incompetent as used in IC 1971, 29-1-18-6 (Burns Code Ed.), and IC 1971, 29-1-18-1(c)(2) (Burns Code Ed.), and accordingly, under an appropriate construction, whether there was sufficient evidence to support that portion of its judgment pertaining to the appointment of a guardian over the estate of appellant.

Martha Wurm was 77 years old when she and her husband Victor moved away from their farm in DeKalb County so that he could enter the hospital and she could live with her daughter and son-in-law, Marilyn and Aloysius A. Molargik. On August 13, 1974, just after they moved, Martha and Victor Wurm signed a general power of attorney allowing the Molargiks to dispose of their 160-acre farm and take care of their other personal assets in the same capacity as themselves.

Victor Wurm died on August 24, 1974. "After the funeral dinner" five of his children, Kathryn C. Haessly, Vincent R. Wurm, Victor J. Wurm, Charles R. Wurm and Donald W. Wurm, convinced their mother, Martha, that she should sign documents naming the City National Bank of Auburn as the guardian of her estate. Her assets at that time consisted of the farmland, several buildings, an automobile, some furniture, some personal possessions and some cash.

On August 30, 1974, Martha Wurm filed a petition to enjoin the filing of any guardianship action over herself, naming as defendants the aforementioned children and their counsel. On September 4, 1974, Charles Wurm, Victor Wurm and Vin-

cent Wurm filed a petition for the appointment of a guardian for the person and the estate of their mother. After consolidating the two petitions, a trial to the court resulted in a judgment which found, in pertinent part, that Martha Wurm was "incompetent and accordingly incapable of either managing her property or caring for herself by reason of old age, infirmity, and her inability to withstand undue and inappropriate pressures exerted upon her by certain of her children, jointly and severally; * * *."

The Indiana Probate Code, IC 1971, 29-1-18-6, *supra,* provides for the appointment of a guardian in those cases where a person has been found to be incompetent. The criteria upon which a finding of incompetency can be based are prescribed in IC 1971, 29-1-18-1 (c) (2), *supra,* which reads as follows:

"(c)  An 'incompetent' is any person who is
(1)  *   *   *
(2)  Incapable by reason of insanity, mental illness, imbecility, idiocy, senility, habitual drunkenness, excessive use of drugs, old age, infirmity, or other incapacity, of either managing his property or caring for himself or both."

In this context it should be noted that no Indiana cases have been construed the meaning of "incompetent" as it relates to the appointment of a guardian under the present statute.[1] Thus, Mrs. Wurm's assertion that she is mentally competent to manage her property draws into question how comprehensive the definition of incompetent should be. She argues that the only reason given for appointing a guardian over her estate arose from the trial court's improper emphasis on her physical attributes as they relate to managing a 160-acre farm. She relies heavily on the case of *Schafer* v. *Haller* (1923), 108 Ohio St. 322, 140 N.E. 517, which held unconstitutional, as a denial of due process, a statute defining incompetency to include purely physical grounds.

---

1.  *See, however, Guardianship of Carrico* v. *Bennett* (1974), 162 Ind. App. 330, 319 N.E.2d 625.

Under earlier Indiana law[2] our Supreme Court in the case of *Kutzner* v. *Meyers* (1915), 182 Ind. 669, 108 N.E. 115, focused on a similar argument. *Kutzner* involved an action against the appointment of a guardian on the grounds that the statute constituted a denial of the due process of law in the taking of liberty and property without a showing of mental incapacity. In upholding the appointment the court held that no State taking was involved, rather a protection was afforded the ward for the sake of his best interests. Therein the court, at 672 of 182 Ind., at 116 of 108 N.E., stated:

> "It has been always the policy of the State to protect those who by reason of youth or incapacity were incapable of managing their estates by placing their property in the hands of guardians or conservators. There is no reason apparent to the court why the same protection should not be extended to persons in their second childhood as is given to infants and persons of unsound mind or habitual drunkards. *Devin v. Scott* (1870), 34 Ind. 67."

In reviewing the sufficiency of the evidence and denying the motion for a new trial, the *Kutzner* court relied on several facts of disability including a showing that a conveyance of land without consideration was obtained through undue influence. The court, at 674 of 182 Ind., at 117 of 108 N.E., further stated:

---

2. *See,* Acts 1911, ch. 218, §§ 1 and 2, p. 533, Ind. Stat. Annot., § 8-301 and § 8-302 (Burns 1933 Repl.), which, in pertinent part, state:
"Guardianship—Old Age, Infirmity, Spendthrift, Etc.

Section 1. *Be it enacted by the general assembly of the State of Indiana.* That whenever any person shall file his complaint in the court having probate jurisdiction in any county, to the effect that any inhabitant of such county is incapable of managing his estate or business affairs because of old age, infirmity, improvidence, or being a spendthrift, * * * .
"Appointment of Guardian—Bond.

Sec. 2. If upon trial, such person shall be found to be incapable of managing his estate or business affairs for any reason provided in this act, such court shall appoint a guardian for such person and his estate. * * * ."

*Cf.:* Acts 1895, ch. 99, § 1, p. 205, Ind. Stat. Annot., § 8-202 (Burns 1933 Repl.), which provides for the appointment of guardians over persons of unsound mind.

"Having in mind the age of appellant and his mental condition incident thereto as shown by the evidence, it was proper for the court to consider these facts in determining whether a guardian should be appointed."

From the foregoing it appears that a concern for the mental condition of the potential ward served as the primary basis for the appointment and as an implicit justification for State intervention to protect his interests.

Under the same statute, in *Silver* v. *Newcomer* (1923), 80 Ind. App. 406, 140 N.E. 455, the Appellate Court upheld a petition for the appointment of a guardian stating that the jury had sufficient reason for finding the ward incapable of managing his estate and business based upon evidence of old age and stroke paralysis.

Two years later the court in *Harvey* v. *Rodger* (1924), 84 Ind. App. 409, 143 N.E. 8 (transfer denied), upheld the appointment of a guardian on other grounds. However, the *Harvey* court would have refused to do so if the evidence had not been sufficient to have warranted a finding that appellant by reason of her age or infirmity, was not mentally incapable of managing her estate and business affairs. In *Perry* v. *Perry* (1940), 108 Ind. App. 93, 27 N.E.2d 133, the appointment of a guardian was again upheld on grounds of old age and infirmity. But in *Perry* the capacity to manage one's affairs was specifically framed in terms of evaluating the mental lapses involved in correctly attending to the rents and debts concerning three pieces of property.

Through these cases we perceive a general commitment to the principle that the appointment of a guardian over one's estate must be grounded on a finding that the person was unable to reasonably deal with his business affairs because of an impairment in his mental judgment, albeit with the recognition that mental attributes can be affected by physical disabilities. Thus no matter how incapacitated a person may be physically, he still has the option of

managing his property through an agent, if the function of his mind is unimpaired. To exclude an evaluation of a person's mental awareness, under the rubrics "old age, infirmity or other incapacity" would make the possibility for a finding of incompetency too broad. Instead the evaluation of whether a person is incompetent should concern his total physiology both physical and mental. *Loss* v. *Loss* (1962), 25 Ill.2d 515, 185 N.E.2d 228; Uniform Laws Annot., Probate Code, § 5-303, Comment, p. 524 (1972); 39 Am. Jur.2d, *Guardian and Ward*, § 21, at 24; Annot., 9 A.L.R.3d 774 (1966).

In the case at bar little oral testimony was heard to the effect that Martha Wurm was mentally incapable of handling her affairs. Of her seven children, four stated that she was physically incompetent to manage the business of her farm while simultaneously attesting to her mental capacity. Two of her children and her doctor opined that she was competent to manage her business affairs. Only one definitely felt that his mother was incompetent and incapable of understanding the extent of her property or the nature of her business affairs or her personal affairs. Such a mixture of testimony alone would appear to be inadequate in light of the important concerns we have expressed in protecting an aged person's free will.

However, it should be noted that other direct evidence in the record discloses that appellant had problems with advanced age and its attendant infirmities of confusion such as would support the judgment of the trial court. Eleven days prior to her husband's death, Martha Wurm executed a power of attorney prepared for her through her daughter Marilyn. She failed to understand that the essential thrust of that instrument was to authorize Marilyn and her husband to sell her farm and manage her affairs. On the night of her husband's funeral Martha Wurm expressed a desire for the appointment of a guardian and accompanied several of her children to an attorney's office to effectuate that desire. Subsequently she became hostile toward these offspring and at the apparent

instigation of Marilyn attempted to renounce the guardianship document she had signed.

The evidence further showed that Martha Wurm was confused about the amounts of her savings and where they were located. She at one time apologized to her doctor for not being able to write him a check though capable of doing so. And, finally, she was unaware of how much the Molargiks were spending from her checking account.

It is not within our province or purview to sift between the interests of seven children to determine the differences between their concerns for their mother and her property. The trial court had occasion to observe the demeanor and attitude of all of the persons connected with this lawsuit. On the record before us there appears ample evidence to support the judgment of the trial court that Martha Wurm was incompetent insofar as she was unable "to withstand undue and inappropriate pressures exerted upon her by certain of her children, jointly and severally." *See generally, McCammon* v. *Cunningham* (1886), 108 Ind. 545, 9 N.E. 455.

Only where evidence is without conflict and leads inescapably to but one conclusion and the trial court has reached a contrary conclusion will its decision be set aside on grounds that it is contrary to law. *Hopple et al.* v. *Star City Elev., Inc., et al.* (1967), 140 Ind. App. 561, 224 N.E.2d 321 (transfer denied).

Accordingly the judgment of the trial court must be affirmed.

Affirmed.

Garrard, J., concurs; Staton, P.J., dissents with opinion.

## DISSENTING OPINION

STATON, P.J.—I dissent from the Majority Opinion for these reasons:

(1) The statutory interpretation of "incompetent" is too broad,

(2) Mrs. Wurm's constitutional rights have been violated;

(3) The evidence is insufficient to establish a guardianship. I would reverse the judgment of the trial court.

## I.

### Incompetent

The Majority Opinion concludes that a person's competency ". . . should concern his total physiology both physical and mental. . . ." It suggests that to ". . . exclude an evaluation of a person's mental awareness, under the rubrics 'old age, infirmity or other incapacity' would make the possibility for a finding of incompetency too broad. . . ." I agree with this suggestion; however, "mental awareness" itself is too broad a test of competency. The test is statutory. IC 1971, 29-1-18-1 (Burns Code Ed. Supp. 1976). It provides that the person must be ". . . Incapable . . . [of] either managing his property or caring for himself or both. . . ." Managing of his property like caring for himself refers to the person's intellect, the ability to exercise his will and judgment. The exercise of his will and judgment does not need the approval of all who might have an occasion to review it. So long as his will and judgment is reasonable and presents no harmful threat to his well-being, he is guaranteed the liberty of exercising his will and judgment over his person and property. If he is capable of selecting a competent agent to manage his business affairs such as preparing tax returns, selling his property, contracting for farm planting and harvesting, and other similar matters, there is no need to appoint a guardian. If he can no longer work his own farm, he should be at liberty to sell the farm if this is his will. His mere physical inability to work a farm is not a sufficient state interest to establish a guardianship. Likewise, if he exhibits a reasonable exercise of will and judgment in who should assist him in caring for himself, he should be at liberty to do so without any interference from the state. The state has no interest in the lawful choice of who

shall assist him in caring for himself. If it were otherwise, an aged or infirm person would be denied the liberty of his person and his right to alienate his property. If it were otherwise, the statute would be unconstitutional.

## II.

### Constitutional Liberty

The liberty of managing your own property and of caring for yourself in a manner of your own choosing is an unalienable right guaranteed by the Ind. Const. art. 1, § 1.[1] The only state interest in limiting this liberty is the protection of the citizen when he can not protect himself or his property. Any extension of the state's interest beyond this paternal supervision is unconstitutional and thereby unlawful. The appointment of a guardian over the person and the estate takes away the liberty of making a last will and testament. This may include the right of determining funeral services and place of burial. It may also include the right to determine who will have your estate and who needs or deserves it most. A guardianship takes away the right to contract with others and the use of your property as you see fit. It may take away the right to associate with those that you would otherwise prefer to associate. It takes away the right to make gifts to those you love and who have need of your help. It takes away your dignity, self-esteem, and much more. Therefore, the state's interference with the liberty of its citizens should be scrutinized. A mere showing of old age and some physical infirmity is not enough to justify the taking away of liberty. *Shafer* v. *Haller* (1923), 108 Ohio St. 322, 140 N.E. 517; *Harvey* v. *Rodger* (1924), 84 Ind. App. 409, 143 N.E. 8 (see

1. "§ 1. Natural rights.—WE DECARE, That all men are created equal; that they are endowed by their CREATOR with certain unalienable rights; that among these are life, liberty and the pursuit of happiness; that all power is inherent in the People; and that all free governments are, and of right ought to be, founded on their authority, and instituted for their peace, safety, and well-being. For the advancement of these ends, the People have, at all times, an indefeasible right to alter and reform their government."

dissenting opinion). A lack of will and judgment to reasonably manage his property and to reasonably care for himself should be the statutory test.[2]

## III.

### Insufficient Evidence

The evidence is insufficient to establish a guardianship. The evidence did establish that Mrs. Wurm was an intelligent seventy-seven-year-old lady who had cared for her sick husband before his death and taken care of the family business during his illness. She had seven grown children. She was good about writing letters to her children and letting them know what she was doing. Her letters are well written and very rational. The one hundred sixty acre farm is rented to Holman Brothers from St. Joe at twenty dollars an acre. Mr. Wurm, before his death, had someone in Auburn do the family taxes. There is no evidence which would show that Mrs. Wurm could not follow the same procedure with the family tax return. Mrs. Wurm knew the balances in her bank account and prepared the necessary checks to pay bills. She knew the amount and location of her property. She was mentally competent by any rational standard. She was competent under the statutory standard.

---

2. Even the authority relied upon by the Majority Opinion had some evidence of the ward's lack of will and judgment to reasonably manage property and to reasonably care for himself. In *Kutzner* v. *Meyers* (1915), 182 Ind. 669, 108 N.E. 115, the eighty-five-year-old ward conveyed a three-thousand-eight-hundred-dollar parcel of real estate to a Mrs. Lamb for one dollar consideration. In *Silver* v. *Newcomer* (1923), 80 Ind. App. 406, 140 N.E. 455, the ward had a stroke; he could not dress himself; several witnesses testified he was of unsound mind. In *Perry* v. *Perry* (1940), 108 Ind. App. 93, 27 N.E.2d 133, the ward had purchased a parcel of real estate and had given a mortgage. He didn't know the amount of the mortgage or how much he had paid on the mortgage; on a promissory note that he had taken, he didn't know how much had been paid, when the last payment was made, or how much the maker owed on the note. In varying degrees, each of theses cases had some evidence before the trial court which might indicate the ward's lack of will and judgment to reasonably manage property and to reasonably care for himself. This kind of evidence is lacking in the Wurm Guardianship. Martha A. C. Wurm's constitutional right to liberty has been violated.

Mrs. Wurm walked a flight of stairs to visit her doctor regularly. She took her medicine as directed and paid her bills promptly. She had back trouble and could not drive an automobile, but a daughter, Marilyn R. Molargik, furnished the needed transportation. She was living with her daughter, Marilyn, who looked after any needs that Mrs. Wurm could not satisfy for physical reasons.

The evidence does show that some of Mrs. Wurm's children were worried that she might make a bad judgment in the future when dealing with her property, but none of them could specifically point to any judgment or exercise of will which had harmed their mother or her property. They merely expressed anxieties because she was so good and easygoing. She was seventy-seven years old. She had agreed to sign a consent and waiver to a guardianship right after her husband's death which had been urged upon her by most of her children. Upon reflection, she changed her mind, but most of the children didn't change their minds to insist on a guardianship. Now, Mrs. Wurm finds herself and her property shackled with a guardianship. Her liberty is lost.

The children testified as to their reasons for wanting a guardianship over their mother's person and estate.

Victor J. Wurm testified:

"Q. Do you think she's mentally good?
"A. I would say that she's mentally good; physically I would say that she's not."

* * *

"Q. Alright, fine. From what you said, testified to, is that the only reason you want a guardian over your mother?
"A. I want her to be protected, I want her to have that farm for herself, if she needs it all she can have it all, if she wants to buy a fur coat that's up to her. I want nothing. I want her to be protected. Today you see and hear on television, radio, about old people getting taken and so forth and I'm concerned that she's protected."

* * *

"Q. Because she walked bent over had doctored with these doctors, five since 1947, you felt that she needs

a guardian both for her person and for her property; is that correct?

"A. More so for her property.

"Q. Oh, you're more interested in her property than her person; right?

"A. The, I'm concerned about someone approaching her on her property and her not being alert enough to know if there's any wrongdoing, so forth."

Donald W. Wurm testified:

"Q. Do you believe that because she cannot drive that this is a reason for a Guardian to be placed over her?

"A. She would have to depend on someone else taking her places to carry on the business that's necessary.

"Q. Yes, and do you believe that your mother knows what moneys she has in the bank

"A. I think so.

"Q. Do you think she mentally knows what property she owns?

"A. Yes, I think so."

\*　　\*　　\*

"Q. What's the need of a Guardian for her person?

"A. That wasn't, I don't think that was intended for the person, it was only—

"Q. It wasn't intended for the person?

"A. Not to my knowledge; I had no intention there; it was only for her, her property.

"Q. Well, you were one of the moving persons to have a Guardian appointed, were you not?

"A. Yes.

"Q. You mean then this petition isn't what you intended it to be?

"A. Yes, it is, Your Honor.

"Q. Well, it says here a Guardian for the person and estate of Martha A. C. Wurm. Now is that what you intend?

"A. I thought the Guardian in the estate was in combination.

"Q. With the Guardian of the person?

"A. Yes.

"Q. You mean that you prefer that the City National Bank tell your mother where she shall live?

"A.   No, sir.

"Q.   What clothing she can buy?

"A.   No.

"Q.   What presents she may send to her grandchildren?

"A.   No.

"Q.   You weren't advised of those matters by your counsel?

"A.   You mean of the Guardian?

"Q.   Yes. That those matters are part of a Guardian of the person of anyone for whom a Guardian is appointed for their person.

"A.   I thought this would still permit Mom to write checks and handle all her affairs with the exception of the—

"O.   Is that what you were advised?

"A.   No, I was not."

\*     \*     \*

"Q.   During the time that you've been around home did your mother ever do any of the business with reference to the farm operation

"A.   To my knowledge she never handled anything on the farm. Papers, maybe insurance papers, maybe grocery checks or things like that; of that nature.

"Q.   Do you think she's able to

"A.   Farm? Papers?

"Q.   Yes. To manage her business affairs?

"A.   Personal business, yes, but not real estate or legal or farm business because I wouldn't even know myself.

\*     \*     \*

"Q.   Are you saying that your mother needs a Guardian because she is not physically able to take care of her business affairs?

"A.   Yes."

Vincent R. Wurm, the oldest of the children, testified:

"Q.   Tell the Court in a word why do you think that your mother needs a Guardian?

"A.   Well, I know from what little I do that you got to watch everything pretty closely; and I also realize that even though I'm fifty-three that sometimes you forget things. And I think that if you don't have

records and if you don't have somebody to help you out, this is near, well, it's hard to do.

"Q. Do you think your mother could manage the farm operation out there and look after it

"A. I think my mother knows what the operations are and I think with somebody doing it she could.

\* \* \*

"Q. Do you believe your mother is an intelligent woman?

"A. Yes.

"Q. Do you believe that she knows how to take care of her personal needs?

"A. Yes.

"Q. Do you believe that she knows the extent to which property she owns?

"A. Yes.

"Q. And you believe that she has a mental capacity then to know the value of her estate?

"A. She is alright."

Kathryn C. Haessly, a daughter, testified:

"Q. Do you think your mother is an intelligent woman?

"A. Yes.

"Q. The nature of the letters you've received from her show that she's an intelligent lady doesn't it?

"A. Yes.

"Q. Do you think that she knows how to care about herself and her person?

"A. Yes.

"Q. Do you think that she knows the properties that she owns?

"A. Yes."

Paul Wurm testified:

"Q. Does she talk to you about other matters in the family or relationship; does she have a good mind, is what I'm saying?

"A. Yes.

"Q. Is her memory good?

"A. Yes.

"Q. Did your mother take care of the business and the operation of the farm prior to your father's death?

"A. Some; her and dad prob—took I don't know; I think they did; no one else took care of it. It was up to Dad and Mom."

Marilyn R. Molargic, a daughter, testified:

"Q. Do you have any objection to the City National Bank being named as guardian for your mother?

"A. Well, I think she's capable herself. She has a good mind and she's doing well."

Mrs. Wurm's doctor, J. Robert Edwards, testified:

"Q. Have you had occasion to talk with Mrs. Wurm when she comes into your office

"A. Yes, on one of my recent visits we talked for a long time; for us.

"Q. From the times that you have seen Mrs. Wurm as your patient did you have any opportunity to observe her mental condition?

"A. Yes.

"Q. And do you have an opinion?

"A. I've never noticed anything unusual. In other words, I've always considered her to be normal and no problem with forgetting to take her medicine, forgetting appointments, no problem with paying her bills, that's always nice from my point of view, but—

"Q. Does she write her own checks out?

"A. She writes her own checks, yeah; she had up until, she came in and apologized profusely recently that she couldn't pay us because she had no rights but then apparently that was reversed and she paid her bill. . .[3]

"Q. Do you believe that Martha Wurm is mentally competent to manage her estate and business affairs?

"A. Yes."

---

3. A possible explanation for this statement is found at page 22 of the Appellant's brief:

"The findings and judgment of the Court are contrary to law in that on September 26, 1974 the Court, after having heard the evidence, found that Martha A. C. Wurm was unable to take care of her major business affairs solely by reason of physical disability but that she was not mentally uncompetent [sic]. Upon argument on the Motion to Correct Errors of Martha A. C. Wurm, the Court, without hearing additional evidence, found that Martha A. C. Wurm was incompetent and accordingly incapable of either managing her property or caring

## IV.

### Conclusion

The majority's statutory interpretation of "incompetent" is too broad. Competency refers to the person's intellect. It refers to his capacity to exercise his will and judgment in a reasonable manner commensurate with his best interests. The evidence to establish a guardianship under the Indiana statute should show a lack of will and judgment on the part of the person to reasonably manage his property and to reasonably care for himself.

A forfeiture of liberty can only be imposed upon a citizen where a sufficient state interest is shown. The State's interest can only be for the protection of the citizen's property and personal well-being. The evidence must clearly show that the citizen can not reasonably protect his property and care for himself before liberty can be taken away by the State. Otherwise, the forfeiture of liberty is unconstitutional.

The evidence in Martha A. Wurm's guardianship proceedings is totally insufficient to justify the appointment of a guardian. Therefore, I would reverse the judgment of the trial court with instructions to vacate the judgment.

NOTE.—Reported at 360 N.E.2d 12.

for herself by reason of old age, infirmity, and her inability to withstand undue pressures exerted upon her by certain of her children, jointly and severally. . . ."